[No. 13943-3-III.   Division Three.   December 7, 1995.]

CLARENCE ANDERSON, ET AL., *Respondents*, v. ENTERPRISE LODGE NO. 2, ET AL., *Appellants*.

---

42

*Michael E. De Grasse; Stephen M. Ringhoffer;* and *Albert J. Golden* and *Golden & Knowlton, P.S.,* for appellants.

*Ronald K. McAdams* and *McAdams, Ponti & Wernette, P.S.,* for respondents.

THOMPSON, C.J. — The Right Worthy Grand Lodge of Washington, Independent Order of Odd Fellows, and its

subordinate, Enterprise Lodge No. 2, appeal a judgment for breach of contract in favor of the Plaintiffs, 63 former members of Enterprise Lodge No. 2. The Defendants contend the judgment violates a general rule against judicial interference with internal affairs of fraternal organizations, and the Plaintiffs failed to pursue their remedy within the organization. We agree, and therefore reverse the judgment and dismiss the complaint.[1]

This is a dispute among members, former members, and units of the Independent Order of Odd Fellows, a fraternal organization. The Grand Lodge of Washington is the governing body for local Odd Fellows lodges throughout the state, including Enterprise Lodge No. 2 in Walla Walla and the related Rebekah units for women, Beehive Lodge No. 70 and Narcissa Lodge No. 2.

In the late 1970s, Enterprise Lodge purchased an athletic facility, known as the Center. The lodge then began offering lifetime memberships, which included use of the Center, for $1,000. These memberships were available only to members of the Odd Fellows or Rebekah lodges. The cost of these lifetime memberships increased through the years, but the offer remained essentially the same. Regular membership in the Enterprise Lodge, without rights to use the Center athletic facilities, cost $40 per year.

By 1990, the Enterprise Lodge had become seriously divided. Some of these disputes focused on the Center and the life membership offer, including adequacy of the funding and whether the arrangement was proper under the organization's bylaws. Other disputes focused on discipline of several Enterprise Lodge leaders.

These disagreements came to a head in November 1990, when the Enterprise Lodge voted to expel one member. Shortly afterward, prospective new members were secretly blackballed, and lodge meetings degenerated into allega-

---

[1]Our conclusion makes it unnecessary to address the Plaintiffs' arguments on cross-appeal.

tions and disputes about interpretation of the organization's rules. One member described the atmosphere:

> Ah, we were dead in the water. We could not bring any new members in. Ah, there was the — the lodge meetings, which generally run a hour were running into three hours. We're going beyond 11:00 in the evening, ah, and nothing was being accomplished.

> There was so much strife in the room that, ah, your stomach just twisted into knots. And, ah, that's why, personally, the last two meetings of the year, ah, I didn't attend. I had made up in my mind that, ah, if this was Odd Fellowship, ah, I wanted no part of it, and so — I was not alone. There were other members who — it's just, as we talked amongst ourselves, that this is out of control; it's just a mess.

Enterprise Lodge members were asked in December 1990 to surrender their charter to the state Grand Lodge. The members rejected the proposal. However, Curtis Eliason, Grand Master of the state Grand Lodge who had attended many of the recent meetings, then revoked the Enterprise Lodge's charter on December 27, 1990. Doors to the Center were padlocked. Mr. Eliason did not give notice to the general membership, and did not conduct a hearing before the revocation.

One disputed issue at trial was whether Mr. Eliason exceeded his authority in revoking the lodge's charter and closing the Center. Both Mr. Eliason and Arthur Craig, Grand Secretary of the state Grand Lodge, interpreted the rules as permitting the Grand Master to revoke a local lodge's charter without notice or hearing, subject to appeal to the state Grand Lodge. On cross-examination, however, Mr. Craig questioned whether this interpretation made sense when read in light of the rules of the Sovereign Grand Lodge, which has jurisdiction over lodges in the United States, Canada, and some European countries.

Another dispute at trial was the effect of the charter revocation on individuals' memberships. Mr. Eliason testified the members of Enterprise Lodge were no longer Odd

Fellows after the revocation. However, Mr. Craig testified the charter revocation did not expel members, who had one year in which to join an undesignated state lodge or transfer to another local lodge.

Soon after the revocation, one group of members began working to restore the Enterprise Lodge charter. No one challenged the revocation within the internal organizational appeals process, which permitted an appeal to the state Grand Lodge, and then to the Sovereign Grand Lodge.

Meanwhile, another group of members filed this lawsuit against the Enterprise Lodge, the state Grand Lodge, and several individual officers and trustees of both organizations. The lawsuit requested restraining orders enjoining the charter revocation, or damages for violation of the plaintiffs' lifetime membership benefits. The trial court granted a temporary restraining order on January 18, 1991, but dissolved the order after a hearing six days later and declined to enter a preliminary injunction.

The Enterprise Lodge's charter was reinstated on February 9, 1991. However, several former members testified they were told they would not be permitted to rejoin. A lodge newsletter at the time stated: "All former members, who did not sign the petition for the lawsuit, and have not been reinstated should come to Lodge or contact Officers for an application for reinstatement." Bud Dotson, who was appointed special deputy by Mr. Eliason to oversee the lodge's property during the revocation period, told the local newspaper the people who joined the lawsuit would be considered for membership, but the chances of them getting back in were "pretty slim."

The members of the newly reinstated Enterprise Lodge developed a plan to address problems related to lifetime memberships and the Center. Lifetime memberships were abandoned, and members who had purchased them in the past were refunded at least half of their original payments. Cost for use of the Center facilities was set at $150 per year, in addition to the regular $40 yearly membership dues.

Before trial, the Defendants moved for dismissal, arguing fraternal organizations are not liable to members in these circumstances, and the Plaintiffs had failed to pursue remedies provided by the organization's bylaws. The court denied the motions, and the Plaintiffs' claim for breach of contract went to jury trial. The jury returned a verdict in favor of the Plaintiffs for $418,446, itemizing the amount among the 63 plaintiffs.

The dispositive issues here are whether the Plaintiffs' claims should be barred because of the general rule against interference in the internal affairs of private associations, or because they did not pursue their claims through the organization's internal appeals process.

■ As a general rule, courts refrain from interfering in the internal affairs of voluntary associations. *Grand Aerie, Fraternal Order of Eagles v. National Bank*, 13 Wn.2d 131, 135, 124 P.2d 203 (1942). An example of this principle is an early Washington case, in which a member sued a fraternal association over a dues increase, claiming the dispute was purely contractual. *Thomas v. Knights of Maccabees*, 85 Wash. 665, 149 P. 7 (1915). The court disagreed:

> A member cannot throw his brothers overboard under the guise of contract and vested right. He must share his life belt with all. If it is not strong enough to sustain him he is in duty bound to sink to the same level with his fellow members, for whatever the words of his contract may imply, it is to be measured by the object of the society which he has bound himself to support.
>
> . . . If we are to make any one consideration paramount over another, it must necessarily be the object of the society. . . . The society being mutual and every member being subject to the same burdens and entitled to the same benefits, it follows that the society cannot be sustained unless the supreme representative body is granted authority to do that which will bring the greatest good to the greatest number.

*Thomas*, 85 Wash. at 673-74.

Both sides of this case agree there are circumstances in

which these disputes are judicially cognizable. Among those circumstances are disputes (1) involving property rights of members, *Washington Local Lodge No. 104 of Int'l Bhd. of Boilermakers v. International Bhd. of Boilermakers*, 33 Wn.2d 1, 74, 203 P.2d 1019 (1949); and (2) involving whether the organization's "proceedings were regular, in good faith, and not in violation of the laws of the order or the laws of the state," *Grand Aerie*, 13 Wn.2d at 135. The Plaintiffs argue both of these exceptions apply.

Determining whether the Odd Fellows violated its own rules first requires determining what those rules provide. With the confusing and sometimes contradictory rules regarding the Grand Master's authority to revoke a local lodge's charter without notice and hearing, it is difficult to make this determination with any certainty. On one hand, the rules require notice and a hearing only when the Grand Lodge revokes a charter, not when the Grand Master does so. On the other hand, the Sovereign Grand Master has no comparable powers, a fact that led one state lodge official to concede his interpretation made no sense.

■ Here, the court apparently left this question to be decided, if at all, by the jury. However, in another context the Supreme Court has held "it is not for the jury to interpret the constitution of the union, nor will the courts interfere with the interpretation placed upon such a constitution by its officers and agents unless such interpretation is arbitrary and unreasonable." *Couie v. United Bhd. of Carpenters & Joiners*, 51 Wn.2d 108, 115, 316 P.2d 473 (1957). In light of the conflicting and confusing rules, the Defendants' interpretation is neither arbitrary nor unreasonable.

We next address whether the lifetime contracts created property rights for the Plaintiffs. The Defendants point out that members of fraternal associations have no severable rights to the organization's property, but have "merely the right to joint use so long as they remain members." *National Grange of Order of Patrons of Husbandry v. O'Sullivan Grange 1136*, 35 Wn. App. 444, 452,

667 P.2d 1105 (1983). The Plaintiffs argue they are not claiming property rights in the Odd Fellows' athletic facility, but the lifetime memberships themselves created property rights.

Cases from other jurisdictions appear to be in conflict over the nature of the rights created by lifetime memberships in fraternal organizations. *See* R.P. Davis, Annotation, *Rights and Liabilities Arising Out of Contract for Lifetime Membership in Social or Fraternal Club or Association,* 10 A.L.R.3d 1357 (1966). In *Boone v. Century Athletic Club,* 49 Ohio App. 155, 195 N.E. 395 (1934), the plaintiff purchased a lifetime membership in a club, based on representations that the club would build a modern, 15-story facility. The club later abandoned the idea, *Boone,* 195 N.E. at 396, but the court held the plaintiff had no claim for breach of contract:

> The applicant did not agree to pay for a proportionate share in a building to be erected. He agreed to pay for a membership in a club. That his fellow-members saw fit to abandon a project which induced his application for membership in the club can not and does not furnish evidence of a failure of consideration for his promise to pay for membership in the club. He, after becoming a member of the club, must bear a proportionate responsibility for the failure of the organization to carry out the original plans proposed.

*Boone,* 195 N.E. at 396.

In *Martin v. Town & Country Dev., Inc.,* 230 Cal. App. 2d 422, 41 Cal. Rptr. 47, 10 A.L.R.3d 1347 (1964), the defendant corporation, which owned an athletic facility and an adjoining hotel, offered lifetime memberships with the purchase of 10 shares of the corporation's stock. The plaintiffs purchased the memberships, but then the corporation leased both properties to another corporation, which closed the athletic facility and converted it to hotel uses. *Martin,* 41 Cal. Rptr. at 50. The court affirmed a judgment for the plaintiffs, agreeing with the trial court that the lifetime membership created a contract that was subject to termination only upon the member's resignation or expulsion. *Martin,* 41 Cal. Rptr. at 51.

■ These cases may be reconciled on the basis that *Boone* involved a private club, while *Martin* involved a for-profit corporation. The purpose of the association in *Boone* was to provide athletic facilities to its members, while the purpose of the corporation in *Martin* was to generate commercial profits for its shareholders. The *Boone* holding, which addresses the question in the context of a private organization, is consistent with *Thomas*, which made paramount the organization's objectives. *Thomas*, 85 Wash. at 673-74.

The Plaintiffs rely primarily on *Garvey v. Seattle Tennis Club*, 60 Wn. App. 930, 933, 808 P.2d 1155 (1991), in which a private club expelled a family from membership. The court treated the relationship as a contractual one, in which the issue was solely "whether the club has violated its own rules." *Garvey*, 60 Wn. App. at 933-34. In this case, the Defendants did not violate the Odd Fellows rules, as the organization's leadership reasonably interpreted them. The rule addressed in *Garvey* does not apply.

The trial court erred in failing to dismiss the Plaintiffs' claims, which are not cognizable at law.

■ We also hold the claims are barred because the Plaintiffs failed to raise the issue in the Odd Fellows' extrajudicial appellate process. Courts generally will not entertain claims if a member has failed to avail himself of such internal remedies. *Couie*, 51 Wn.2d at 114; *Garvey*, 60 Wn. App. at 936. However, exhaustion of internal appeals is not required when (1) the organization's action is "arbitrary, unlawful, and void"; (2) the appeal process is "expensive, slow, and subject to great delay"; or (3) the procedure would be "futile and vain." *Furniture Workers Union v. United Bhd., C.J.*, 6 Wn.2d 654, 663-64, 108 P.2d 651 (1940).

Although the Plaintiffs argue there was no specific process for appealing the rescission of the lifetime memberships, Mr. Craig testified any member aggrieved by the Grand Master's action could have appealed to the state Grand Lodge. There was an appeal process, and the Plaintiffs chose not to pursue it.

The Plaintiffs also contend an internal appeal would have been futile, either because they were no longer interested in Odd Fellows membership or because they had been told (either directly or through the local newspaper) that their chances of readmission were slim at best. Of course, a member's choice to abandon membership is tantamount to abandonment of the lifetime membership contract, a fact that would have rendered this case unnecessary. Also, there was little evidence that all or any of the Plaintiffs relied on (or were even aware of) the comments on which their argument depends here. More importantly, there is no evidence that the internal appeal process *in fact* would have been unfair. *See Garvey*, 60 Wn. App. at 936. There is no basis for concluding the internal appeal process would have been futile. The Plaintiffs failed to pursue their available internal remedies in the organization.

We conclude the trial court erred in failing to dismiss the Plaintiffs' claims, both because the claims are not cognizable, and because they failed to pursue their Odd Fellows remedies. The judgment is reversed, and the case is dismissed.

SWEENEY and SCHULTHEIS, JJ., concur.

Reconsideration denied January 4, 1996.

Review denied at 129 Wn.2d 1015 (1996).