**Cheryl LEVANT, Appellant,**

v.

**Warren R. WHITLEY, Appellee.**

**No. 99–CV–639.**

District of Columbia Court of Appeals.

Argued May 25, 2000.
Decided July 20, 2000.

---

Theodore S. Allison, Washington, DC, for appellant.

Christopher G. Hoge, Washington, DC, for appellee.

Before STEADMAN, REID and GLICKMAN, Associate Judges.

REID, Associate Judge:

This case involves an intense dispute between Cheryl G. Levant,[1] former Grand Worthy Matron ("Ms. Levant" or "GWM") of the Georgiana Thomas Grand Chapter of the Order of the Eastern Star, Prince Hall Affiliation ("the GT Grand Chapter" or "the Eastern Star, D.C.") and Warren R. Whitley, the Most Worshipful Grand Master ("Mr. Whitley" or "MWGM") of the Most Worshipful Prince Hall Grand Lodge of Free and Accepted Masons, Prince Hall Affiliation of the District of Columbia, Inc. ("Prince Hall, D.C." or "the Grand Lodge")[2] over a request that the Eastern Star, D.C. pay rent for space used in the Prince Hall, D.C. building, and over disagreements regarding a conference and the proper relationship between the MWGM and the GWM. The dispute culminated in Ms. Levant's removal as GWM on June 2, 1998. After her removal, Ms. Levant filed a complaint against Mr. Whitley seeking declaratory and injunctive relief; and damages, in part, for "publicly placing person in false light," and defamation. In addition, one of the counts of Ms. Levant's complaint consisted of a "derivative action by corporate stockholders and members" relating to the handling of a fund known as the Jurisdictional Account.

The trial court granted summary judgment in Mr. Whitley's favor. Ms. Levant

1. When this case began, Ms. Levant was known as Cheryl G. Williams. Subsequently, she married Emory M. Levant, Past Most Worshipful Grand Master of the Prince Hall Grand Lodge.

2. The history of Prince Hall lodges was summarized in *International Free and Accepted Modern Masons v. Most Worshipful Prince Hall Grand Lodge, Free & Accepted Masons of Kentucky*, 318 S.W.2d 46 (Ky.1958):

Prince Hall, a free Negro, a native of Barbados, West Indies, became a worthy resident of Massachusetts. He knocked and the door of Masonry was opened to him by a British Military Lodge in Boston in the year 1775. He was the first man of African descent to become a Master Mason in America. Hall became a Revolutionary War patriot, receiving recognition from General Washington and other leaders. After the war, Hall and his brethren were refused a charter by the Provincial Grand Lodge of Massachusetts because of their race. Upon their application, the Grand Lodge of England, "under authority of his Royal Highness, Frederick Duke of Cumberland, Grand Master of the Most Ancient and Honorable Society of Free and Accepted Ancient Masons," granted them a charter on September 29, 1784, under the name of African Lodge No. 459, to be opened in Boston. That was done in May 1787. Later, African Lodge No. 459 declared itself to be a Grand Lodge with jurisdiction throughout the United States, and the Grand Lodge of England granted a patent or provincial powers to the African lodge as such. After the death of Prince Hall in 1807, the colored Masonic grand lodges changed their names in his honor and many succeeding lodges have adopted it.

As time went along, Prince Hall Grand and subordinate lodges of colored Masons were chartered and organized throughout the United States, Canada and other countries, all of them springing from African Lodge No. 459.

*Id.* at 48–49 (citations omitted).

filed a timely appeal contending, in part, that: (1) she is entitled to a judicial remedy in connection with her alleged wrongful expulsion from office, the allegedly unfair procedures followed by Prince Hall, D.C., and the breach of her alleged contractual rights; (2) she established a prima facie case of defamation; and (3) the trial court erred in dismissing her derivative action claim. We affirm in part and reverse in part.

We conclude that Ms. Levant has failed to establish an appropriate basis for judicial intervention in the dispute over her removal as GWM, which involves the internal affairs and leadership of a private voluntary organization. Hence, we affirm the trial court's judgment with respect to Ms. Levant's removal. We also conclude that, as a matter of law, Ms. Levant cannot prevail on her defamation and false light claims. Finally, because the trial court erroneously determined that no derivative action could be brought by Ms. Levant, and because the derivative action alleges that the MWGM acted in a manner inconsistent with operating procedures pertaining to the Jurisdictional Account, which contains contributions by members of both Prince Hall, D.C. and Eastern Star, D.C., we remand Ms. Levant's derivative action claim to the trial court for factual findings and conclusions, under Super. Ct. Civ. Rule 23.1, with instructions to address two issues: (1) whether Ms. Levant fairly and adequately represents similarly situated members of the GT Grand Chapter, an unincorporated association; and (2) whether it would have been futile for Ms. Levant to make a demand for relief, with respect to the Jurisdictional Account, on the appropriate authority within the structure of the masonic organizations. In all other respects, we affirm the judgment of the trial court.

**3.** The Afro–American newspaper for June 6,1998 to June 12, 1998, published a short, two-paragraph article indicating that the GWM had been "suspended" by the MWGM, that the GWM "would not comment" and that

### FACTUAL SUMMARY

On June 2, 1998, by letter, Mr. Whitley, in his capacity as MWGM of Prince Hall, D.C., informed Ms. Levant that she had been removed from her position as GWM of the Eastern Star, D.C. On that same day, the MWGM sent another written communication to Most Worshipful Grand Masters, Grand Worthy Matrons, and Leaders of all Masonic National Bodies, indicating that Ms. Levant had been removed as GWM and should now be called Past Matron, but that the GT Chapter could bestow on her the title of Past Grand Worthy Matron, if its members voted to do so.[3]

In his letter to Ms. Levant, Mr. Whitley generally accused her of insubordinate and disrespectful acts. He stated, in part: "I informed you ... that I was unhappy with your attitude, your combativeness, confrontational nature and actions, and your total disrespect for the Office of Grand Master." In support of this accusation, Mr. Whitley referenced Ms. Levant's alleged behavior in meetings with him; her contact with a Prince Hall, D.C. officer whom she allegedly "chewed out"; an open meeting on May 14, 1998, to discuss payment of rent for space in the Prince Hall, D.C. building; and a May 13, 1998 planning meeting with hotel staff in preparation for the Seventy–Ninth Conference of Grand Masters and the Fiftieth Anniversary Conference of Grand Chapters. Ms. Levant's behavior during these meetings was alleged to have been "combative" and "negative," and she was accused of ignoring or disputing the directives of the MWGM. In addition, she was criticized for failing to attend certain meetings.

Mr. Whitley's letter also cited a decision by Ms. Levant to purchase glasses for gifts to persons attending the Conference, even though she was aware that the Conference

the MWGM "could not be reached for comment." The last sentence of the article read: "Mr. Whitley is over the men and women who participate in Prince Hall Masonry in Washington, D.C."

Committee would be selling glasses; and her attempt to place an unsolicited article and picture in a new Masonic Journal. The MWGM informed Ms. Levant that persons in other jurisdictions had become aware of her behavior and that her "actions were also bringing shame to the Office of the Grand Worthy Matron." He reminded Ms. Levant that Prince Hall, D.C. had created the Eastern Star, D.C.,[4] and that "[Prince Hall, D.C.] is the supreme authority in this Masonic Jurisdiction." He added that: "The Grand Master may arrest [remove] the Jewel of Office of any officer, grand or subordinate, and censure, reprimand or suspend any member of the Craft for improper or unmasonic conduct."

Ms. Levant sent a June 5, 1998 letter to Mr. Whitley expressing a desire to appeal her removal and to be reinstated to her position as GWM. She also filed a complaint in the Superior Court on June 15, 1998. Furthermore, in response to a June 18, 1998 letter from the Prince Hall Committee on Grievances and Appeals ("the Grievance Committee") requesting specific documentation of the reasons for her appeal, Ms. Levant submitted a letter dated July 13, 1998, denying "any breach or violation of any of the Landmarks, Articles and Rules of the Constitution and By-Laws applicable to this Masonic Jurisdiction," or "any written and/or oral order as well as directive issued by the [MWGM]." She referred to Mr. Whitley's accusations of combativeness and disrespect as "subjective assessments." Moreover, she maintained that she personally attended scheduled meetings relating to the work of the GT Grand Chapter, and sent representatives to special meetings when they conflicted with her "vocational commitments."

Furthermore, Ms. Levant explained that she did not "chew out" a Prince Hall officer, and that, in that case, "[t]he issue was an outgrowth of communication, protocol and due respect as well as recognition of a chain of authority through the Office of the Grand Worthy Matron." She defended her actions with respect to the payment of rent issue, detailing the process that the GT Grand Chapter used to study the matter; and discussed the meeting with the hotel representatives, denying "any intent to have the last word or present a confrontational aspect." Her purchase of glasses for the Conference of Grand Chapters was not intended as competition with the Conference Committee, but as "tokens of love to the visiting Grand Worthy Matrons and Grand Worthy Patrons." Furthermore, the article and picture were submitted to the Masonic Journal in response to a solicitation of ads for the Journal. Finally, she reiterated her desire to appeal her removal as GWM, and pointed out that "Rules 74 and 75 of the [ ]Prince Hall[ ] Corpus Juris do[ ] not address appeals for the Sisters of the Order of the Eastern Star."

Between August 3 and 12, 1998, the Prince Hall Grievance Committee interviewed Ms. Levant and Mr. Whitley, as well as twenty-three witnesses identified by them. The report of the Grievance Committee, notes taken on each interview, and various other documents were sent to the MWGM on September 5, 1998. The report concluded that Mr. Whitley violated no "Masonic statutes or Masonic laws written or unwritten" in removing Ms. Levant from office, and that he acted within his authority as MWGM. A letter was also sent to Ms. Levant advising her of the Grievance Committee's decision.

The Grievance Committee presented its report at a special session of the Grand Lodge, open only to Master Masons. Following a motion to accept the report of the Grievance Committee, Mr. Emory Levant made a substitute motion to reinstate Ms. Levant as GWM. After discussion, the motion "to accept the Committee's report with no further action by the Grand Lodge" passed. Mr. Levant's second motion to reinstate Ms. Levant was rebuffed. Then, the MWGM quoted from the An-

---

**4.** The GT Grand Chapter was created in May 1892.

cient Regulations and accused Ms. Levant of violating the regulations by filing a lawsuit. Thereupon, a motion was made to suspend Ms. Levant. After discussion, the motion was withdrawn. Subsequently, however, on September 24, 1998, Mr. Whitley suspended Ms. Levant from the Eastern Star, D.C., until "notifi[cation] to the contrary," because the filing of her lawsuit was deemed in violation of Prince Hall, D.C.'s Ancient Regulation on Behavior.[5] The suspension directive, sent to "all owing allegiance" to Prince Hall, D.C., further advised that those who in the future give support to Ms. Levant's lawsuit also would be suspended.

After September 1998, focus on the controversy involving Ms. Levant shifted to the trial court. On February 17, 1999, Mr. Whitley moved for summary judgment, and a few weeks later Ms. Levant filed an opposition. In an order docketed on April 16, 1999, the trial court granted Mr. Whitley's motion.

## ANALYSIS

Generally, Ms. Levant challenges the order of the trial court granting summary judgment in this case to Mr. Whitley. "To prevail upon a motion for summary judgment, the moving party must demonstrate that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law." *Potts v. District of Columbia*, 697 A.2d 1249, 1251 (D.C.1997) (citing Super. Ct. Civ. R. 56(c); *Young v. Delaney*, 647 A.2d 784, 788 (D.C.1994)). "The party opposing a properly supported motion for summary judgment may not rest upon the mere allegations contained in its pleadings, but must set forth 'specific facts showing that there is a genuine issue for trial.'" *Id.* (citing Super. Ct. Civ. R. 56(e); *Smith v. Washington Metro. Area*

*Transit Auth.*, 631 A.2d 387, 390 (D.C. 1993) ("requiring the non-moving party to 'produce enough evidence to make out a prima facie case in support of her claim'")). "We review the grant or denial of a summary judgment motion *de novo.*" *See Kitt v. Capital Concerts, Inc.*, 742 A.2d 856, 858 (D.C.1999) (citing *Walton v. District of Columbia*, 670 A.2d 1346, 1353 (D.C.1996)). The grant of a summary judgment motion is proper " 'if (1) taking all reasonable inferences in the light most favorable to the nonmoving party, (2) a reasonable juror, acting reasonably, could not find for the nonmoving party, (3) under the appropriate burden of proof.'" *Id.* (quoting *Kendrick v. Fox Television*, 659 A.2d 814, 818 (D.C.1995)) (other citation omitted).

Specifically, Ms. Levant first contends that she was "entitled to a judicial remedy for [her] wrongful expulsion from her office," and that in addressing her demand for declaratory and injunctive relief, the trial court should not have invoked "the maxim that trial courts are 'loathe' to become involved in the internal affairs of privately founded social organizations...." The trial court stressed that Prince Hall, D.C. is "a private philanthropic organization dedicated to charitable causes and a strong belief in God...." Consequently, the court concluded that Ms. Levant's "loss is not sufficiently serious enough to merit judicial interference." Ms. Levant takes issue with the conclusion that her injury resulting from her removal as GWM was not serious enough to merit judicial intervention, and further argues that "[a] factual dispute existed concerning the application of the procedural rules of the organizations involved," and thus, summary judgment was inappropriate. She

---

5. During the September 5 special session of the Grand Lodge, Mr. Whitley quoted the following passage from the Ancient Regulations:

If any complaint be brought, the Brother found guilty shall stand to the award and determination of the Lodge, which is the

proper and competent judge of all such controversies (unless ... appeal[ed] to the Grand Lodge ...)... but you must never go to the law about what concerneth Masonry. In our disposition of this matter, we do not address this passage from the Ancient Regulations.

also challenges the trial court's grant of summary judgment with respect to her defamation and derivative action claims. We turn first to the appropriateness of judicial intervention in the dispute between the GWM of the Eastern Star, D.C. and the MWGM of Prince Hall, D.C.

*General Nature, Structure and Power of Prince Hall, D.C. and Eastern Star, D.C.*

To ascertain the principles applicable in this case regarding the appropriateness of judicial intervention, we will first engage in a general review of the undisputed facts regarding the general nature, structure and power of the Prince Hall, D.C. and the Eastern Star, D.C. organizations. Mr. Whitley suggests that Prince Hall, D.C. is a quasi-religious and a private, incorporated fraternal organization. Thus, its dispute with Ms. Levant, the GWM of the GT Grand Chapter, should be treated in the same manner as the church in *Kelsey v. Ray*, 719 A.2d 1248 (D.C.1998), or the proprietary educational institution in *Marjorie Webster Junior College, Inc. v. Middle States Ass'n of Colleges & Secondary Sch., Inc.*, 139 U.S.App.D.C. 217, 432 F.2d 650 (D.C.Cir.1969), and consequently, the judiciary should not intervene in this matter. Ms. Levant describes Prince Hall, D.C. variously as a private fraternal organization and a private voluntary organization, and the Eastern Star, D.C. as an historic fraternal organization affiliated with Prince Hall, D.C. Both parties agreed during oral argument, however, that Prince Hall, D.C. and the Eastern Star, D.C. properly may be characterized as private voluntary membership organizations. Prince Hall, D.C. is an incorporated private voluntary organization or association and Eastern Star, D.C. appears to be an unincorporated private voluntary association. While there are overtones of a religious orientation in the governing documents of Prince Hall, D.C. and Eastern Star, D.C., we conclude that both groups may best be called private voluntary membership associations, not religious or professional organizations akin to the Bible Way Church [6] or the Middle States Association of Colleges and Secondary Schools.[7]

With respect to the structure and power of the organizations, it is clear that while the GT Grand Chapter of the Eastern Star, D.C. and its GWM have extensive executive, legislative and judicial powers resembling those accorded to the Grand Lodge of Prince Hall, D.C. and its MWGM, the Grand Lodge and the MWGM have greater powers.[8] Under the Prince Hall, D.C. Constitution, the GT Chapter of the Eastern Star, D.C. is an "appendant" or subordinate organization.[9] Thus, Prince Hall, D.C.'s legislative, executive and judicial powers, and the prerogatives of its MWGM surpass and impact those of the Eastern Star, D.C. and its GWM. Indeed, the Constitution of Prince Hall, D.C. specifies, in Article XIII, § 2, that: "[E]very Grand Lodge is the supreme authority in its jurisdiction...." The Grand Lodge has the authority to "prescribe ... regulations for the administration of its lodges ..., as well as Appendant Bodies empowered to work [within its jurisdiction]." *Id.*

**6.** *See The Bible Way Church of Our Lord Jesus Christ of the Apostolic Faith of Washington, D.C. v. Beards,* 680 A.2d 419 (D.C.1996).

**7.** *See Marjorie Webster Junior College, Inc., supra.*

**8.** *See* Prince Hall, D.C. Constitution, Article XIII, §§ 1 through 6, concerning powers of the Grand Lodge and Article XIV, §§ 1 through 28 pertaining to the prerogatives and duties of the MWGM; *see also* GT Grand Chapter, Constitution, Article II, regarding governmental powers, and GT Grand Chapter, By–Laws, Article VII, §§ 1 and 2, relating to the duties of the GWM and the Grand Worthy Patron who is "the official representative of the Grand Master and Grand Lodge to the ... Eastern Star[, D.C.]."

**9.** Neither Ms. Levant nor Mr. Whitley designated the entire constitution and bylaws of their respective organizations as part of the record on appeal. Only certain excerpts from those documents are included in the record. Ms. Levant attached to her brief provisions of the Eastern Star, D.C.'s Constitution and By–Laws pertaining to the powers of the GT Grand Chapter and its GWM.

The Prince Hall, D.C. Constitution calls for "faithful allegiance and implicit obedience" from lodges, masons and "Appendant Bodies." *Id.* Moreover, the Grand Lodge has authority over appeals from aggrieved parties. CONST. OF PRINCE HALL, D.C., art. XIII, § 3. "In its legislative capacity, [Prince Hall, D.C.] makes the laws; in its judicial capacity, it applies them; and in its executive capacity, it enforces them." CONST. OF PRINCE HALL, D.C., art. XIII, § 2. The only restrictions on the actions of Prince Hall, D.C., its Grand Lodge and MWGM, are found in a document known as the "Ancient Landmarks," and "there is no appeal" from the decisions of the Grand Lodge. *Id.*

Specifically included in Section 5 of Article XIV of the Prince Hall, D.C. Constitution is the power to "arrest [remove] the Jewel of office of any officer, grand or subordinate ..., pending the next session of the Grand Lodge or masonic trial by a commission of Master Masons assembled for that purpose, whichever is earlier." In addition, under Article VII, § 2, of the Eastern Star, D.C.'s By–Laws, the Grand Worthy Patron, who is an official representative of Prince Hall, D.C.'s MWGM, is assigned specific duties in relation to the GT Grand Chapter. For example, he must "preside at the annual election and installation of officers" of the GT Grand Chapter. The position of the Grand Worthy Patron is further evidence that the powers of the GT Grand Chapter and its GWM are limited by those of Prince Hall, D.C. and its officers.

■ Having determined the nature, structure and powers of Prince Hall, D.C. and Eastern Star, D.C., we turn now to an examination of the legal principles applicable to a private incorporated voluntary membership association (Prince Hall, D.C.), and a private unincorporated voluntary membership association (Eastern Star, D.C.). "[C]ourts ordinarily will not interfere with the management and internal affairs of a voluntary association." *Avin v. Verta,* 106 A.2d 145, 147 (D.C.1954) (citing *Fish v. Huddell,* 60 App.D.C. 263, 51 F.2d 319 (1931)); *see also National Ass'n for the Advancement of Colored People v. Golding,* 342 Md. 663, 679 A.2d 554, 558 (1996) ("as a general rule, courts will not interfere in the internal affairs of a voluntary membership organization"). Nonetheless, and notwithstanding Prince Hall, D.C.'s status, and that of the Eastern Star, D.C. as private voluntary membership associations, and the general rule against interference in the internal affairs of such organizations, Ms. Levant asserts that where voluntary membership organizations fail to follow their own procedures, the courts should intervene.[10]

■ The circumstances under which the courts are justified in ruling on disputes involving voluntary membership organizations are not entirely settled.[11] For pur-

---

10. Ms. Levant belatedly argues on appeal that Prince Hall, D.C. breached its contractual agreement with her as a member of the Eastern Star, D.C. This argument was not made to the trial court and we decline to consider it on appeal. *See Miller v. Avirom,* 127 U.S.App.D.C. 367, 369–70, 384 F.2d 319, 321–22 (1967).

Furthermore, Ms. Levant asserts in her brief that she will not receive certain pecuniary benefits due to her removal as GWM prior to the end of her term; the record before us shows no evidence supporting this assertion. However, Ms. Levant attached to her brief By–Laws of the GT Grand Chapter showing, in Article VII, § 1, ¶ 20, that she would receive a "donation of $800.00 at the close of the year for meritorious services." Since she did not raise any question concerning an alleged economic interest in the trial court, we decline to consider it on appeal. *See Miller, supra.*

11. In *Golding, supra,* the Court of Appeals of Maryland summarized various principles which have been applied by the courts to support judicial intervention in cases pertaining to an unincorporated private voluntary membership association. Intervention may occur where: (1) "property rights or a pecuniary interest is at stake;" (2) "economic necessity" exists; (3) "either property rights or civil rights are at stake;" (4) contractual rights are implicated; (5) "officers [of the association] acted fraudulently or in bad faith;" (6) the association has breached its

poses of this appeal, we simply assume, without deciding, as Ms. Levant argues, that intervention would be appropriate when an organization failed to follow its own rules. We turn now to an examination of that question.

fiduciary duty to its members; (7) "the seriousness of the injury to the individual [outweighs] the association's interest in autonomy and freedom from judicial oversight." 679 A.2d at 560.

Relatively early decisions in this jurisdiction focused on the fifth category of intervention, listed above, and relied on concepts of fraud, bad or good faith, and fairness. In *U.S. ex rel. De Yturbide v. Metropolitan Club of the City of Washington,* 11 App.D.C. 180, 201(1897), the court stated that in the absence of: "fraud or bad faith or want of fairness on the part of the board of governors in passing [a] resolution of expulsion," the courts will not interfere in the affairs of a social club or corporate entity. In *Berrien v. Pollitzer,* 83 U.S.App.D.C. 23, 25, 165 F.2d 21, 23 (1947), a case involving the exclusion of a woman from the National Women's Party, the court focused on the concept of a "judgment arrived at [ ] in good faith." This jurisdiction's early approach to judicial intervention in the affairs of social clubs was summarized in *Angland v. Doe,* 105 U.S.App.D.C. 16, 18, 263 F.2d 266, 268 (1958) ("This jurisdiction long since recognized that courts may not interfere unless a determination by the club's constitutional authorities is *ultra vires,* fraudulent, or made contrary to good faith."). A later case concerning a private professional association, *Marjorie Webster Junior College, Inc., supra,* appeared to emphasize the second and seventh categories of intervention, determining that judicial intervention "must be related to the necessity for intervention," and that: "[T]he extent to which deference is due to the professional judgment of the association will vary both with the subject matter at issue and with the degree of harm resulting from the association's action." 139 U.S.App.D.C. at 222–23, 432 F.2d at 655–56 (footnotes omitted).

Currently, for incorporated private voluntary membership associations, Maryland follows "the business judgment rule" in matters relating to "the corporation's .management." *Golding, supra,* 679 A.2d at 559. "The business judgment rule insulates business decisions from judicial review absent a showing that the officers acted fraudulently or in bad faith." *Id.* (citing *Black v. Fox Hills,* 90 Md. App. 75, 599 A.2d 1228, 1231 (1992) (other citation omitted)). Moreover, Maryland follows "a narrow rule" to "determin[e] whether [its] courts should intervene in the disputes of

## The Removal of the GWM of the Eastern Star, D.C. From Office

The only provision directly relating to the removal of a GWM by a MWGM appears in Article XIV, § 5 of Prince Hall,

[private unincorporated] voluntary membership organizations": "[W]hen the tribunals of the order have power to decide a disputed question, their jurisdiction is . exclusive, whether there is a bylaw stating such decision to be final, or not, and ... the Courts cannot be invoked to review their decisions of questions coming properly before them, except in cases of fraud." *Id.* at 561 (citing *Donnelly v. Supreme Council,* 106 Md. 425, 67 A. 276, 278 (1907)) (other citations omitted). Under Maryland law, fraud "include[s] 'action unsupported by facts or otherwise arbitrary.' " *Id.* (quoting *Martin v. United Slate Etc. Ass'n,* 196 Md. 428, 77 A.2d 136, 141 (1950)).

For other cases, *see Anderson v. Enterprise Lodge No. 2, Independent Order of Odd Fellows,* 80 Wash.App. 41, 906 P.2d 962, 966 (1995) ("[D]isputes [which] are judicially cognizable" include those "(1) involving property rights of members ..., and (2) involving whether the organization's proceedings were regular, in good faith, and not in violation of the laws of the order or the laws of the state."); *Reed v. Quatkemeyer,* 647 So.2d 172, 173 (Fla.Ct.App.1994) ("Absent a property interest, the governing body of a social organization is the final arbiter of the sufficiency of cause for expulsion," and "the courts will not interfere with the decisions of fraternal organizations with regard to its grievances absent fraud or bad faith."); *Putka v. First Catholic Slovak Union of the United States and Canada,* 75 Ohio App.3d 741, 600 N.E.2d 797, 802 (1991) ("In the absence of mistake, fraud or management activity in excess of its corporate powers, a decision by [a voluntary] association in accord with its own charter and rules made by the governing body must be accepted by courts of law."); *Rutledge v. Gulian,* 93 N.J. 113, 459 A.2d 680, 683, 686 (1983) ("[T]he [associational] member's valuable personal relationship to the organization [is] the true basis for judicial relief against wrongful expulsion," but "judicial intrusion should be confined to procedures that are fundamentally unfair."); *Moran v. Vincent, Worthy Grand Matron of the Grand Chapter of the Order of the Eastern Star,* 588 S.W.2d 867, 870 (Tenn. Ct.App.1979) (where no property rights are affected by an expulsion from membership, "courts may intervene where the procedures of the [organization] were not followed or where its officers acted in an arbitrary, oppressive, or unlawful manner").

D.C.'s Constitution. This section gives the MWGM the power to "arrest [remove] the Jewel of Office of any officer, grand or subordinate ..., pending the next session of the Grand Lodge or a Masonic trial by a commission of Master Masons assembled for that purpose, which ever is earlier." Article VII of the GT Chapter's By–Laws, relating to the powers and duties of the GWM, contains no power to remove a grand officer.[12] Despite Ms. Levant's insistence that she was entitled to a masonic trial, Article XIV, § 5, specifies that the removal of a grand officer may be considered at the earlier of either "the next session of the Grand Lodge" or "a masonic trial." In that regard, Ms. Levant's appeal of her removal by the MWGM ultimately was considered by the next session of the Grand Lodge. We see nothing in the record to suggest that there was a purposeful effort to avoid a masonic trial. Moreover, an examination of the procedures followed before her case was considered by the Grand Lodge reveals no procedural unfairness.

In the case before us, the MWGM's letter of June 2, 1998 provided detailed notice of the charges against the GWM, and the reasons for her removal from office. When the Prince Hall, D.C. Grievance Committee asked Ms. Levant to specify the reasons for her appeal, she was given her first opportunity to be heard with respect to her removal. Her response came in the form of a detailed letter of July 13, 1998 to the Grievance Committee. Ms. Levant was afforded a second opportunity to be heard when she was interviewed by the Grievance Committee. Not only did the Grievance Committee's procedures include an interview with Ms. Levant, but also one with Mr. Whitley, as well as twenty-three other persons, prior to rendering its decision concluding that the MWGM violated no written or unwritten Masonic law, and acted within his authority in removing the GWM. Ms. Le-

vant complains that she was not allowed to have an attorney present during her interview, but we are unable to find anything in the masonic documents, that are part of the record, mandating the presence of an attorney when a person is interviewed by the Grievance Committee.

The final decision on Ms. Levant's removal as GWM was taken by Prince Hall, D.C. through its Grand Lodge which, under Article XIII, § 2 of its Constitution, "is the supreme authority in its jurisdiction" with the power not only to "prescribe ... regulations for the administration of ... Appendant Bodies [such as the GT Grand Chapter]," but also to hear "appeals from aggrieved parties." In addition, under this article and section of the Prince Hall, D.C. Constitution, the GT Grand Chapter owes "faithful allegiance and implicit obedience" to Prince Hall, D.C.'s Grand Lodge. Therefore, by accepting the report of the Grievance Committee, the Grand Lodge implicitly rejected Ms. Levant's appeal from the MWGM's decision to remove her as GWM.

Assuming that judicial inquiry is appropriate here, we conclude that the process accorded Ms. Levant, with regard to her challenge of the MWGM's removal decision, was fundamentally fair and not in conflict with designated procedures, and tainted neither by fraud, nor bad faith, nor arbitrary action by Prince Hall, D.C. and its MWGM. *See Golding, supra.* This conclusion also is consistent with a case involving the expulsion of a member of a Maryland chapter of the Order of the Eastern Star by its own Grand Chapter. As the court concluded in that case: "The judgment of the tribunal created by the laws of the [O]rder [of the Eastern Star] should be regarded as final and conclusive in the absence of any suggestion that the right of the appellee to a fair and regular hearing was not duly protected." *Grand Chapter, Order of Eastern Star v. Klutch,* 144 Md. 491, 125 A. 72, 74 (1924). *See also*

12. The GWM has the power, under Article VII, § 1, ¶¶ 11 and 12, to " 'suspend for good cause' a member of the Grand Chapter, or an officer of a Subordinate Chapter."

1046

*Moran, supra,* determining that the procedures used by the Order of the Eastern Star to expel a member "were substantially in accordance with the Constitution and By–Laws of the [organization] and me[ ]t the requirements of substantial fairness." *Id.* at 870.

Furthermore, the case before us is different from that in *Universal Lodge No. 14 Free and Accepted Masons v. Valentine,* 134 Md. 505, 107 A. 531 (1919) where the appellant, who was expelled, learned on the day of his scheduled trial that charges had been filed against him and that a masonic committee would convene on that same day to investigate the charges. There, the Court of Appeals of Maryland declared that: "[A] member charged with such a serious offense as to warrant his expulsion from the [O]rder should be given some notice of the charge and a reasonable opportunity to defend himself before the tribunal appointed to try him." *Id.* at 535. Ms. Levant was given ample time to respond to Mr. Whitley's June 2, 1998 letter. Accordingly, for the reasons stated, we conclude that judicial intervention in this dispute between the leaders of two private voluntary membership associations is inappropriate, and we affirm the judgment of the trial court insofar as it concerns Ms. Levant's removal as GWM. We turn now to Ms. Levant's other arguments on appeal.

*Ms. Levant's Other Arguments On Appeal Relating To Defamation and Derivative Action*

Ms. Levant maintains that her "expulsion from office, suspension from membership and denunciation of [her by Mr. Whitley] constitute defamation," because "the predicate for her removal from office— that she was unfit for the office ... is false." Specifically, she appears to claim on appeal that both Mr. Whitley's June 2, 1998 letter, and the June 1998 article in the Afro–American regarding her "suspension," constituted defamatory publications.

Mr. Whitley contends that Ms. Levant has identified no published defamatory statement. The trial court concluded that Ms. Levant's "claims for defamation and false light [ ] fail[ed]," [13] because she did not "identify any specific defamatory statement made about her by the defendant that would warrant such a claim."

Under our case law, a publication is defamatory " 'if it tends to injure [a person] in [her] trade, profession or community standing, or lower [her] in the estimation of the community.' " *Howard Univ. v. Best,* 484 A.2d 958, 988 (D.C.1984) (quoting *McBride v. Merrell Dow and Pharm., Inc.,* 540 F.Supp. 1252, 1254 (D.D.C.1982)) (other quotation omitted). Furthermore, "an allegedly defamatory remark must be more than unpleasant or offensive; the language must make the plaintiff appear odious, infamous, or ridiculous." *Id.* (quotation and internal quotation omitted). In addition, the burden is on the plaintiff, in this case Ms. Levant, to prove the defamatory nature of the publication. We agree with the trial court that Ms. Levant failed to sustain her burden. At most, the June 2, 1998 letter reflects an assertion that Ms. Levant and Mr. Whitley had an intense disagreement over certain masonic issues, and that Ms. Levant, acting in her capacity as GWM, did not follow certain directives of Mr. Whitley, given in his role as MWGM. Therefore, on the record before us, we conclude that the assertions set forth in Mr. Whitley's letter, including the bare accusation that Ms. Levant's "actions were ... bringing shame to the Office of [GWM]," do not rise to the level of defamation. *See Best, supra,* 484 A.2d at 988.

In addition, the article published in the Afro–American newspaper, which reported Ms. Levant's suspension, contains no statement from Mr. Whitley or Ms. Levant, and accurately points out that: "Mr. Whitley is over the men and women

13. Ms. Levant appears not to have pursued her false light claim on appeal. At any rate, we find nothing in the record to support such a claim. *See Kitt, supra.*

who participate in Prince Hall Masonry in Washington, D.C." Nothing in this article makes Ms. Levant "appear odious, infamous, or ridiculous." *Best, supra,* 484 A.2d at 988. Therefore, we see no reason to disturb the trial court's conclusion that Ms. Levant "fail[ed] to identify any specific defamatory statement made about her by [Mr. Whitley]...."

Finally, Ms. Levant argues that she is "entitled to maintain a derivative action," under Super. Ct. Civ. R. 23.1, and that she "was able to prove a derivative claim for breach of official duties by Grand Master Whitley." Mr. Whitley contends that Ms. Levant may not maintain a derivative action because she did not meet the requirements of Rule 23.1. Rule 23.1 permits a shareholder of a corporation or a member of an unincorporated association to file a derivative action to enforce a right of the organization.[14] In her complaint, Ms. Levant alleges, in paragraph 38, that her "action to enjoin [Mr. Whitley] from extracting any further disbursements from the Grand Lodge Jurisdictional Fund is an action in the best interest of Grand Lodge financial management." Moreover, she alleged, in paragraph 39, that her "wish to delay a decision on the proposed lease agreement until the Grand Lodge annual session is a reasonable alternative which she had every right to suggest and was in the best interest of the Grand Lodge management of its finances." In addition, she asserted that she "has made all efforts [as] Grand Worthy Matron and as a member to propose alternative solutions regarding the proposed lease agreement and to alert the membership about the misuse of the Jurisdiction Account but has been censured in this matter due to her removal from office." Two paragraphs of her affidavit accompanying her complaint appear to concern the derivative action. Both paragraphs relate to the Jurisdictional Account:

15. I have been denied the opportunity to fulfill my duties as part of shared governance in the withdrawal and expenditure of monies from the Jurisdictional Account, thus the integrity of the operation and mechanics related to the Jurisdiction Account as voted by the membership of the Jurisdiction has been violated.

16. I was denied the performance of my duty to sign as Grand Worthy Matron on specific checks which were processed to withdraw funds from the Jurisdictional Account.

Mr. Levant also filed an affidavit on June 15, 1998, specifying his status as a member of Prince Hall, D.C. and setting forth his past offices. With respect to the Jurisdic-

---

14. The trial court mistakenly granted summary judgment in favor of Mr. Whitley because Ms. Levant "concedes that she has been unable to provide any evidence that [Prince Hall, D.C.] has stockholders...." Rule 23.1 provides:

In a derivative action brought by 1 or more shareholders or members to enforce a right of a corporation or of an unincorporated association, the corporation or association having failed to enforce a right which may properly be asserted by it, the complaint shall be verified and shall allege, (1) that the plaintiff was a shareholder or member at the time of the transaction of which the plaintiff complains or that the plaintiff's share or membership thereafter devolved on the plaintiff by operation of law, and (2) that the action is not a collusive one to confer jurisdiction on the Court which it would not otherwise have. The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort. The derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of the shareholders or members similarly situated in enforcing the right of the corporation or association. The action shall not be dismissed or compromised without the approval of the Court, and notice of the proposed dismissal or compromise shall be given to shareholders or members in such manner as the Court directs.

Rule 23.1 is virtually identical to Fed.R.Civ.P. 23.1.

tional Account he stated the following in paragraphs 7 and 9 of his affidavit:

7. I am aware that an appropriation of the Jurisdictional Fund without the co-signature of the Grand Worthy Matron and by the approval of the Jurisdiction by vote is in violation of the Funds disbursement process.

9. That the June 2, 1998 removal of the Grand Worthy Matron and the appropriation of the Jurisdictional Fund without proper authorization violate the spirit of the Craft's Landmark and Constitution and may fatally impact on the integrity of our organization.

A third affidavit was filed on June 15, 1998 by Yvonne D. Baskerville, a member of the GT Grand Chapter, a past officer of the Chapter, and the then Vice President of the Prince Hall Charitable Foundation. She claimed "first hand knowledge and familiarity with the ... procedure regarding the Organizations Jurisdictional Fund." She also stated that the disbursement of funds from the Jurisdictional Account without the GWM's co-signature and a vote of the Jurisdiction violates "the Funds disbursement process." Ms. Baskerville also asserted that "the removal of [the GWM] ... denies her of the opportunity to report on the unauthorized disbursement of Jurisdictional Funds during the Jurisdictional meeting held on June 18, 1998."

In his answer to Ms. Levant's complaint, Mr. Whitley admitted that "disbursement of funds from [the Jurisdictional] [A]ccount may only be authorized by Jurisdictional vote," but denied that such disbursement required the signature of both the MWGM and the GWM, and that he had made disbursements without the required vote. He also denied Ms. Levant's allegation that she "continued to voice her concern to [him] about the potential misuse of the Jurisdictional Fund."

The record on appeal shows that during her June 12, 1999 deposition, Ms. Levant described the Jurisdictional Account as follows:

The [J]urisdictional [F]und has moneys that have been placed there by both the sisters and brothers, and it has been voted on and accepted that both the Grand Master and the Grand Worthy Matron ha[ve] to have their signature on each check. It does not matter which Grand Treasurer, but the Grand Master and the Grand Worthy Matron's signatures must appear on each check. And the Grand Worthy Matron's signature was not on these checks....

At her deposition, Ms. Levant was shown a document listing certain checks and asked: "What ... indicates to you that there were improper disbursements from the [J]urisdictional [F]und?" She responded: "The check numbers of the checks that did not have my signature."

In his statement of undisputed facts, accompanying his motion for summary judgment, Mr. Whitley included paragraphs 18 and 19, relating to the Jurisdictional Account:

18. Plaintiff has made no allegation that there were improper expenditures from the [Prince Hall, D.C.] Jurisdictional Account by Defendant.

19. MWPGM Levant acknowledged, when confronted with checks written on the Jurisdictional Account during his tenure, that 16 out of 25 checks did not have the joint signature of the Grand Worthy Matron.

Ms. Levant's statement of undisputed material facts, filed with her opposition to Mr. Whitley's motion for summary judgment, contained paragraph 5 regarding the Jurisdictional account: "Defendant improperly disbursed funds from the Jurisdictional Account[,] an account collectively owned by the [GT Grand Chapter] and the [Prince Hall, D.C. Grand Lodge]."

In moving for summary judgment on Ms. Levant's derivative action claim, Mr. Whitley stated: "Plaintiff alleges that '[T]he Prince Hall Grand Lodge is a membership corporation without stockholders.' Thus, by definition there can be no derivative action by corporate stockholders. De-

fendant is unaware of any authority for a derivative suit by members of a 'membership corporation' (presumably referring to a not for profit corporation)." In response to Mr. Whitley's summary judgment motion on this point, Ms. Levant stated in her Opposition, "Plaintiff concedes that this cause may require additional testimony to show that the Grand Lodge has some stockholders."

The parties and the trial court proceeded under the assumption that a Rule 23.1 derivative action may only be brought by a shareholder. It is true that Prince Hall, D.C. is a corporation without shareholders, but Eastern Star, D.C. is an unincorporated [15] association. Under the plain words of Rule 23.1, a member of an unincorporated association may bring a derivative action. From the record before us, it appears that Ms. Levant's derivative action claim is brought in her capacity as a member of the GT Grand Chapter and as a past high officer of that Chapter. Moreover, she is alleging disbursements from a Jurisdictional Fund, which includes funds contributed by the Eastern Star, D.C., without use of the proper disbursement procedures, specifically the co-signature of the GWM and the vote of the Jurisdiction. As such, she appears to be asserting an injury to the unincorporated association, that is, deprivation of a say as to how the monies it contributed to the Jurisdictional Account should be expended, or an opportunity to approve such expenditures. Thus, in our *de novo* review of this matter, we must determine whether Ms. Levant satisfied the requirements of a Rule 23.1 derivative action.

Rule 23.1 requires that: (1) the complaint be verified; (2) the complaint allege or plead: (a) that the action is not collusive; (b) that the plaintiff was a member "at the time of the transaction or occurrence that is the basis for the complaint;" and (c) "with particularity [any] efforts . . .

made by the plaintiff" to get the unincorporated association to take the desired action, or the reasons "for not making the effort;" and (3) "the plaintiff . . . fairly and adequately represent[s] the interests of . . . members similarly situated. . . ." Mr. Whitley focuses on the requirement that a plaintiff adequately represent the interests of the members of the unincorporated association. He asserts that: "Appellant has not even made an allegation that in the litigation she 'fairly and adequately represents the interests of the shareholders or members similarly situated.'" Further, he argues, "No other 'similarly situated members' have been identified by Appellant, and it is clear that she is pursuing this litigation to advance her own personal interests."

Mr. Whitley ignores the burden of proof with respect to the "fairly and adequately represents" requirement of Rule 23.1. "[U]nlike in class actions under Rule 23, in which the burden of proving adequacy is generally on the plaintiff, the defendant in a derivative action has the burden of demonstrating that the plaintiff is an inadequate representative." MOORE'S FEDERAL PRACTICE § 23.1.09[2] (3d ed., 2000) (footnote omitted). Moreover, "unlike the procedure of Rule 23, the [trial] court need not make a preliminary affirmative determination that the plaintiffs will fairly and adequately represent the interest of people similarly situated." *Id.* (footnote omitted). However, when that determination is made, the trial court must consider whether Ms. Levant represents the interests of "members similarly situated," and whether there are factors, such as economic antagonism and "use of the derivative action as leverage in a corporate [or associational] struggle," which would make her an inappropriate representative. *Id.* at § 23.1.09[5][a] and [b] (footnote omitted). Moreover, the trial court's determination will be "reviewed only for an

---

**15.** Although Rule 23.1 appears to allow a member of a corporation without shareholders to bring a derivative suit, we need not

address that issue under the circumstances of this appeal.

abuse of discretion." *Id.* at § 23.1.09[2] (footnote omitted).

 With respect to the other procedural requirements of Rule 23.1, Ms. Levant filed an affidavit which can satisfy the verification requirement. *Id.* at § 23.1.05. She also alleged in her complaint that the action was not collusive for the purpose of conferring jurisdiction on the court, and that she was a member of the association at the time of the check transactions on the Jurisdictional Account which took place without her signature. Ms. Levant's complaint contains a general allegation that she "has made all efforts [as] Grand Worthy Matron and as a member to propose alternative solutions regarding the proposed lease agreement and to alert the membership about the misuse of the Jurisdiction account but has been censured in this matter due to her removal from office." This general allegation does not meet the requirement that "[t]he complaint allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority...." Rule 23.1. However, Rule 23.1 permits a plaintiff to plead futility in making the demand on the board of directors or other comparable authority. *See* MOORE, *supra,* § 23.1.08[2][g][iv]; *see also Flocco v. State Farm Mutual Automobile Ins.* Co., 752 A.2d 147, 156 (D.C.2000); *In re Mortgage and Realty Trust Securities Litigation,* 787 F.Supp. 84, 87 (E.D.Pa.1991) ("Maryland ... recognize[s] an exception to the demand requirement where such a demand would be futile"); *Smith v. Gordon,* 668

F.Supp. 520, 522, 523 (E.D.Va.1987) (stating the majority rule that: "director approval of alleged misdeeds, without specific allegations of bias or self-dealing, is insufficient to render demand futile," and the minority rule that: "plaintiff's allegations of board approval of the alleged wrong [are] sufficient to excuse demand") (citations omitted). Whether Ms. Levant's pleadings contain sufficient particularized facts to satisfy the futility rule is a matter which the trial court has not addressed. Hence, there are no factual findings on which we may make a reasoned determination.

Accordingly, we are constrained to remand this matter to the trial court solely for the purpose of determining whether Ms. Levant has satisfied, or can satisfy through amendment of her complaint, two requirements imposed by Rule 23.1:(1) fair and adequate representation of similarly situated members; and (2) the allegation of particularized facts showing the futility of making a demand on the appropriate authority [16] with respect to the alleged wrongful act of disbursing funds from the Jurisdictional Fund without the co-signature of the GWM and a Jurisdiction vote and the harm resulting to the association.[17] In all other respects, we affirm the judgment of the trial court.

---

**16.** "Rule [] 23.1 requires that the complaint allege any demand made on an authority comparable to the board of directors." MOORE, *supra,* at § 23.1.08[2][d]. "Any person or entity, other than the board, that has the full legal authority to manage the corporation's [or the association's] affairs meets this standard." *Id.* A factual question may exist as to whom Ms. Levant could have made the required demand since she was the highest ranking officer of the GT Grand Chapter and had been removed from office, and, because,

presumably, Mr. Whitley, who removed her as GWM, had full legal authority, at least as a co-signator, to manage the Jurisdictional Account.

**17.** Depending upon the trial court's resolution of these requirements, it may need to determine whether Prince Hall, D.C. and Eastern Star, D.C. are required parties to the derivative action. *See Flocco, supra,* 752 A.2d at 154 (applying Illinois law to a double derivative action involving a corporate entity).