Todd A. BLODGETT, Appellant,

v.

The UNIVERSITY CLUB,
et al., Appellees.

No. 04–CV–810.

District of Columbia Court of Appeals.

Argued Jan. 3, 2006.
Decided Aug. 9, 2007.

John R. Fornaciari, Washington, with whom Robert M. Disch and John J. Vecchione were on the brief, for appellant.

Bernard J. Casey, with whom Edward J. McAndrew, David L. Tanenholz, and Anthony P. Bisceglie were on the brief, for appellees.

Before REID, GLICKMAN, and FISHER, Associate Judges.

FISHER, Associate Judge:

The University Club concluded that appellant Todd Blodgett had used "the Club's facilities to conduct business with persons who publicly expound racist and anti-Semitic views," and it expelled him from membership for this and other reasons. Blodgett alleges that the expulsion violated the District of Columbia Human Rights Act of 1977,[1] which, among other things, prohibits discrimination based on "source of income" and "political affiliation." The Club, a public accommodation covered by the Human Rights Act, disputes appellant's interpretation of the Act and argues in the alternative that enforcing it in the manner requested would unconstitutionally infringe the Club's First Amendment freedom of expressive association. Blodgett has made additional claims sounding in contract and in tort.

---

1. D.C.Code §§ 2–1401.01 et seq. (2001 & 2006 Supp.).

We affirm the trial court's grants of summary judgment, which rejected Blodgett's claims of discrimination based on source of income and political affiliation as well as his other claims, which included defamation and invasion of privacy (false light), breach of contract, fundamental unfairness, and intentional infliction of emotional distress. We also affirm the trial court's grant of a protective order and its denial of a motion for admission *pro hac vice* submitted by one of Blodgett's advisers.

## I. The Factual Background

### A. Bad Publicity

Todd Blodgett joined The University Club, a Washington D.C. private social club, in August of 1993, and he used the Club regularly to entertain business clients, to socialize, and to exercise. Blodgett was known to be active in Republican politics; he also worked for groups that promoted "right-wing" political causes, and he was hired as an independent contractor for Liberty Lobby, an organization run by Willis Carto. Blodgett sold advertising in *The Spotlight*, a newspaper in which Liberty Lobby took anti-Israeli and anti-Zionist stands.

Blodgett's association with Carto and Liberty Lobby was unpopular with many of the Club's members. Its Jewish members in particular were offended by the anti-Zionist views of Carto, Liberty Lobby, and *The Spotlight*. No by-law or rule purports to limit the type of guest who may be invited, but, in an effort to placate his fellow members, Blodgett voluntarily stopped bringing Carto to the Club.

In March 1999 Dr. William Pierce, a nationally known white supremacist and chairman of an organization called the "National Alliance," contacted Blodgett, seeking to purchase his shares of stock in Resistance Records, which Blodgett himself has characterized as "a purveyor of hate music." The two men dined at the Club in April 1999 and discussed a sale of the stock. A month or two later, Blodgett sold his interest in the record label to Dr. Pierce for $15,000. The Club acknowledges that Dr. Pierce's appearance at the Club did not cause a disturbance or engender controversy at the time.

However, on January 12, 2000, *The Washington Post* published an article about Dr. Pierce entitled "The Pied Piper of Racism." It reported that Pierce and Blodgett had dined at the Club in April of 1999 and had "haggled over" control of Resistance Records. The next day Blodgett sent the Club's Board of Governors a letter apologizing for the publicity caused by Dr. Pierce's visit. Despite Blodgett's apology, controversy erupted within the Club's membership. In addition to creating general "tension and consternation" in the Clubhouse, the *Post* article prompted several members to write the Club's Board of Governors, demanding Blodgett's expulsion.[2]

### B. The Investigation

The Club's Board of Governors met on January 14 and conferred on a course of action, agreeing to appoint two or three members of the Club to investigate the factual basis for the *Post* article, including Blodgett's professional involvement with

2. For example, members sent letters stating that "[f]or several years, many members of the University Club have known about the business activities of Mr. Blodgett and how, on occasion, these activities were conducted in the club," condemning Blodgett's "long-standing association with hate mongers," and asserting that Blodgett's defense of "[i]t's just business ... 'business' conducted in our Club-cannot be ignored.... [T]he Board should terminate his membership for cause."

hate group organizations. The investigators would also review Blodgett's behavior in the Club, including previous allegations of anti-Semitism. The same day, the Executive Committee of the Board voted unanimously to suspend Blodgett's membership pending the outcome of the investigation. According to Blodgett, Club President Beck and General Manager Albert Armstrong informed him that his immediate resignation would eliminate the need for the investigation—which, they warned, inevitably would result in his expulsion. Armstrong explained that unless Blodgett resigned, the Club would disclose Blodgett's membership file—which contained possibly embarrassing allegations and complaints of misconduct, some predating Blodgett's membership in the Club—to the investigating committee. Blodgett refused to resign and he was suspended.

During the next two weeks, two members of the Club investigated alleged misconduct by Blodgett, interviewing more than twenty-five witnesses. On February 3, 2000, they submitted a report which contained numerous allegations that Blodgett, while on Club premises, had engaged in racist, anti-Semitic, homophobic, and misogynic conduct. These included allegations that Blodgett had used offensive racial and ethnic slurs such as "nigger" and "kike lawyer" and "wops." Blodgett denied all of these allegations.

## C. The Expulsion

The Board invited Blodgett and his counsel to a meeting scheduled for March 2, 2000, to determine if disciplinary action should be taken. Beforehand, Blodgett and his counsel were sent copies of all e-mail and correspondence from Club members to the Board related to the investiga-

tion, as well as a copy of the investigative report, which contained typed summaries of the interviews conducted. (The summaries did not disclose the identities of the individuals who had been interviewed.) After hearing from Blodgett and his counsel, the Board voted 8–2 to afford Blodgett an opportunity to resign and, if he refused, to expel him. He was expelled

> for the following reasons, each of which provides independent grounds for expulsion: (1) his repeated use of offensive racial and ethnic slurs while on Club premises; (2) his non-joking references to and comments about women, African–Americans, Jews and Native Americans in a derogatory and offensive manner while on Club premises and (3) his use of the Club's facilities *to conduct business with persons who publicly expound racist and anti-Semitic views.*

(Emphasis added.)

## D. The Litigation

On March 2, 2001, Blodgett filed a civil complaint which he has since amended. Naming the Club, certain Board Members, General Manager Armstrong, and three other Club members as defendants, he alleges breach of the Club's by-laws, failure to provide due process, breach of contract, defamation, invasion of privacy (false light), violations of the Human Rights Act, intentional infliction of emotional distress, breach of the obligation of good faith and fair dealing, aiding and abetting, and invasion of privacy by giving unreasonable publicity to private life.[3] On June 1, 2004, in a forty-three-page memorandum opinion and order, Judge Long denied Blodgett's motion for partial summary judgment and granted summary judgment to appellees on all counts. Blodgett has appealed this judgment, as well as Judge Duncan–Pe-

---

**3.** These were the counts pled in Blodgett's Substituted First Amended Complaint. Blod-

gett did not name all of the defendants in each count.

ters' protective order barring P. Jay Fetner from attending depositions on his behalf, Judge Long's denial of a motion for reconsideration, and Judge Long's denial of Fetner's motion for admission *pro hac vice.*

## II. Principles Governing Our Review

■■■ "Summary judgment is appropriate only when there are no material facts in issue and when it is clear that the moving party is entitled to judgment as a matter of law." *Puma v. Sullivan,* 746 A.2d 871, 874 (D.C.2000) (internal quotation marks and citation omitted). In reviewing a trial court order granting a summary judgment motion, "we conduct an independent review of the record...." *Wallasey Tenants Ass'n v. Varner,* 892 A.2d 1135, 1138 (D.C.2006). Although we must view the record in the light most favorable to the non-moving party, *Deutsch v. Barsky,* 795 A.2d 669, 673 (D.C. 2002), mere conclusory allegations are insufficient to avoid entry of summary judgment. *Musa v. Continental Insurance Co.,* 644 A.2d 999, 1002 (D.C.1994). *See also* Super. Ct. Civ. R. 56(e) ("the ... response, by affidavits or as otherwise provided in this Rule, must set forth specific facts showing that there is a genuine issue for trial"). " '[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.' " *Brown v. George Washington Univ.,* 802 A.2d 382, 385 (D.C. 2002) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). " 'The mere existence of a scintilla of evidence ... will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party].' " *LaPrade v. Rosinsky,* 882 A.2d 192, 196 (D.C.2005) (quoting *Liberty Lobby,* 477 U.S. at 252, 106 S.Ct. 2505).

■■■ "The Supreme Court has recognized that '[c]onstitutional adjudication [is] a matter of "great gravity and delicacy" ' and that courts should generally avoid ruling on constitutional questions unless they have no other choice." *Lewis v. Hotel & Restaurant Employees Union, Local 25,* 727 A.2d 297, 301 (D.C.1999) (citing *Kremens v. Bartley,* 431 U.S. 119, 128, 97 S.Ct. 1709, 52 L.Ed.2d 184 (1977)). We therefore begin our inquiry by considering Blodgett's claims under the Human Rights Act; if the Club's conduct did not constitute a potential violation of the Act, we will not need to consider its constitutional defense.

## III. The Human Rights Act

### A. General Provisions

In 1973 the District of Columbia Council adopted Title 34 of the District of Columbia Rules and Regulations, known as the "Human Rights Law" (34 DCRR § 3.1). Concerned that these police power regulations might not have the same force and effect as a statute, the post-Home Rule Council of the District of Columbia re-enacted the regulations as The Human Rights Act of 1977. The first section of the Human Rights Act explains the intention of the legislature:

It is the intent of the Council of the District of Columbia, in enacting this chapter, to secure an end in the District of Columbia to discrimination for any reason other than that of individual merit, including, but not limited to, discrimination by reason of race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, gender identity or expression, familial status, family responsibilities, matriculation, *political affiliation,* genetic information, disability, *source of income,* status as a victim of an intrafamily offense, and place of residence or business.

D.C.Code § 2–1401.01 (2001 & 2006 Supp.) (emphasis added).[4] The Human Rights Act is a broad remedial statute, to be generously construed. *Wallace v. Skadden, Arps, Slate, Meagher & Flom*, 715 A.2d 873, 889 (D.C.1998); *Simpson v. District of Columbia Office of Human Rights*, 597 A.2d 392, 398 (D.C.1991). We have also described the Human Rights Act as a "powerful, flexible, and far-reaching prohibition against discrimination of many kinds." *Executive Sandwich Shoppe, Inc. v. Carr Realty Corp.*, 749 A.2d 724, 732 (D.C.2000) (citation and internal quotations omitted).

D.C.Code § 2–1402.31 prohibits discrimination in public accommodations[5] and provides, in very broad terms, that:

(a) General. It shall be an unlawful discriminatory practice to do any of the following acts, wholly or partially for a discriminatory reason based on the actual or perceived: race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, gender identity or expression, familial status, family responsibilities, genetic information, disability, matriculation, *political affiliation, source of income*, or place of residence or business of any individual:

(1) To deny, directly or indirectly, any person the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodations;

\* \* \*

(b) Subterfuge. It is further unlawful to do any of the above said acts for any reason that would not have been asserted but for, wholly or partially, a discriminatory reason based on the actual or perceived: race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, gender identity or expression, familial status, family responsibilities, genetic information, disability, matriculation, political affiliation, source of income, or place of residence or business of any individual.

*Id.* (2001 & 2006 Supp.) (emphasis added). We begin our analysis by deciding whether the Club's conduct properly could be construed as discrimination based on "source of income."

Such term shall not include any institution, club, or place of accommodation which is in its nature distinctly private.... A place of accommodation, institution, or club shall not be considered in its nature distinctly private if the place of accommodation, institution, or club:

 (A) Has 350 or more members;

 (B) Serves meals on a regular basis; and

 (C) Regularly receives payment for dues, fees, use of space, facilities, services, meals, or beverages directly or indirectly from or on behalf of nonmembers for the furtherance of trade or business.

In this case, appellees do not contest that the Club is a public accommodation as defined by this section.

---

**4.** Formerly D.C.Code § 1–2501 (1981). This section of the Human Rights Act has remained substantially unchanged since 1977, having been amended only to add new classes to the list of those already protected by the Act. ("[P]hysical handicap" replaced with "disability," D.C. Law 10–129, 41 D.C.Reg. 2583 (June 28, 1994); "familial status" added by D.C. Law 12–242, 46 D.C.Reg. 952 (April 20, 1999); "genetic information" added by D.C. Law 15–263, 52 D.C.Reg. 237 (April 5, 2005); "gender identity or expression" added by D.C. Law 16–58, 53 D.C.Reg. 14 (March 8, 2006); "status as a victim of an intrafamily offense" added by D.C. Law 16–273, 54 D.C.Reg. 18 (May 4, 2007)).

**5.** As relevant here, D.C.Code § 2–1401.02(24) (2001 & 2006 Supp.) defines "place of public accommodation" broadly, but also provides:

## B. Source of Income

"Source of income," a defined term,

means the point, the cause, or the form of the origination, or transmittal of gains of property accruing to a person in a stated period of time; including, but not limited to, money and property secured from any occupation, profession or activity, from any contract, agreement or settlement, from federal payments, court-ordered payments, from payments received as gifts, bequests, annuities, life insurance policies and compensation for illness or injury, except in a case where conflict of interest may exist.

D.C.Code § 2–1401.02(29) (2001 & 2006 Supp.). Even a cursory reading of this definition reveals that it is extraordinarily broad.

Blodgett argues that the Club's own statement of reasons for expelling him demonstrates that it did so, in part, because he had been using the Club's facilities to "conduct business with persons who publicly expound racist and anti-Semitic views." He asserts that this declaration is direct evidence of (indeed, an admission to) discrimination based on a forbidden factor—a source of his income. The Club counters that taking action against a member based on the persons he associates with or "conducts business with" *in the Club facilities* is not the same as basing action on his source of income. It asserts that Blodgett "was expelled for using the Club facilities in a manner that associated the Club with persons, organizations and views that were incompatible with Club values." It maintains that Blodgett "has shown not a single fact to suggest that any of the Board members either knew or cared whether he earned income from" his contacts with those persons and organizations.

■ We thus must decide whether the third reason the Club gave for expelling Mr. Blodgett—"his use of the Club's facilities to conduct business with persons who publicly expound racist and anti-Semite views"—is a proxy for source of income discrimination.[6] When interpreting a different statute, the United States Court of Appeals for the District of Columbia Circuit observed that "[t]he term 'doing business' is not one possessed of but a single meaning in law. It is used in connection with many different situations and must be characterized and defined according to the context." *Goldberg v. S. Builders, Inc.*, 87 U.S.App. D.C. 191, 193, 184 F.2d 345, 347 (1950). Agreeing with this observation, we turn our focus to the context in which the Club used the term.

The Club's investigation was triggered by the *Post* article, which reported that "Blodgett and Pierce quietly sorted through the details of a complicated new partnership over dinner in the Taft dining room of the University Club, where Blodgett is a member." The newspaper also reported that the two men "haggled over" control of Resistance Records. That article prompted letters from members calling for Blodgett's expulsion, while condemning the "hate business" that he conducted in the Club and expressing shock that he "appear[ed] to have been in business with professional bigots." President Beck's notes indicate that on January 14th the Board of Governors appointed an investigative body to, among other things, "review the factual basis of the article including Todd's professional involvement with hate group organizations. . . ." At the conclusion of the investigation, the Board ex-

6. Blodgett has not alleged that it would violate the Human Rights Act to expel him for the behavior described in the first two reasons. Rather, he asserts that these explanations are factually unfounded and mere pretexts for unlawful discrimination.

pelled Blodgett based, in part, upon "his use of the Club's facilities to *conduct business with* persons who publicly expound racist and anti-Semitic views." (Emphasis added.)

■ The Club argues initially that a Human Rights Act claim may not be based upon "source of income" discrimination alone. Rather, it asserts, " 'source of income' must be tied to some other protected class within the District of Columbia's traditional sphere of interest." According to the Club, "[i]t is only when 'income' is a badge of some other kind of protected class—*e.g.*, welfare as a possible link to age, race, national origin, familial status— that the language has meaning in an anti-discrimination enforcement context." We reject these arguments, which ignore the plain language of the statute and the "basic principle of statutory construction ... that each provision of the statute should be construed so as to give effect to all of the statute's provisions, not rendering any provision superfluous." *Veney v. United States*, 681 A.2d 428, 433 (D.C.1996) (en banc) (quotation marks, internal editing, and citation omitted).[7]

We do not doubt that defendants who discriminate based on "source of income" may often run afoul of other provisions of the Human Rights Act, such as those which prohibit discrimination based on age, familial status, or disability. We acknowledge as well that this court has not outlined the boundaries of source-of-income discrimination under the Human Rights Act. *See Borger Mgmt., Inc. v. Sindram*, 886 A.2d 52, 64 (D.C.2005) (remanding for further proceedings on claim of source-of-income discrimination); *see also Feemster v. BSA Ltd. P'ship*, 471 F.Supp.2d 87 (D.D.C.2007) (plaintiffs had not established a *prima facie* case of source-of-income discrimination under the DCHRA). However, there is no reason to think the Council intended this category of protection to be superfluous or redundant.

The definition the Council crafted demonstrates that it intended the prohibition against "source of income" discrimination to have a significant reach.[8] Whereas a Connecticut statute forbidding discrimina-

---

**7.** A thorough review of the legislative history of the Act, as well as that of its predecessor, the pre-Home Rule "Human Rights Law," 34 DCRR §§ 1.1 *et seq.* (1973), has revealed no explanation of the rationale for giving "source of income" a protected status. We flatly reject the idea that we should treat "source of income" as superfluous because it is the seventeenth of nineteen classes listed in the Human Rights Act.

**8.** Some jurisdictions have taken care to specify that the "source of income" must be "lawful." *See* CONN. GEN.STAT. ANN. § 46a–63 (3) (West 2007) (" '[l]awful source of income' means income derived from Social Security, supplemental security income, housing assistance, child support, alimony or public or state-administered general assistance"); St. Louis, Mo., Ordinance 67119 § 9(D) (June 13, 2006) ("legal source of income" is undefined as used in the section prohibiting discrimination in public accommodations); Portland (Oregon) City Code § 23.01.030 (2001) ("source of income" excludes "any money or property derived in a manner made illegal or criminal by any law, statute or ordinance"). It seems unlikely that the Council intended that the members of a club must continue to associate with someone who makes his living as a contract killer or a drug dealer. In other words, it might be "absurd" to read the statute to require such indifference to criminal behavior. *See Varela v. Hi–Lo Powered Stirrups, Inc.*, 424 A.2d 61, 65 (D.C.1980) (en banc) (we must depart from a literal reading of a statute's text when that construction will produce an absurd result). Indeed, in one portion of the Human Rights Act, prohibiting discrimination in issuing or canceling motor vehicle insurance, the Council used the term "lawful occupation." D.C.Code § 2–1402.71. No issue involving an unlawful source of income is presented in this case, however.

tion in places of public accommodation has a narrow definition of "source of income" focusing on public assistance, child support, Social Security, and the like,[9] our statute has a more capacious formulation. Having expressed its intention to put an end to discrimination in the District of Columbia, the Council obviously recognized that race, gender, religion, and national origin were not the only historical bases for discrimination. Class conscious societies have often focused on the source of one's income, distinguishing, for example, between *nouveaux riches* and those with inherited wealth; between merchants and professionals, "blue collar" workers and those who wear "white collars." This is not such a case, however, and, once again, we need not attempt to define the boundaries of "source of income" discrimination.

We conclude that the Council did not intend to prohibit the Club from expelling Mr. Blodgett in the circumstances presented here. In context, it is clear that the Club was focusing on Blodgett's behavior in, and use of, the Club, not on the sources of his income. "[H]is repeated use of offensive racial and ethnic slurs while on Club premises; ... his non-joking references to and comments about women, African–Americans, Jews and Native Americans in a derogatory and offensive manner while on Club premises and ... his use of the Club's facilities to conduct business with persons who publicly expound racist and anti-Semitic views" all made the Club a less desirable place-for current members and for prospective applicants as well. Blodgett relies solely on the Club's own words, having proffered no other evidence

of discriminatory intent. However, the Club's use of the term "conduct business with" does not transform its self-protective decision into prohibited discrimination based on the source of Blodgett's income. In the context of the investigative record and the other reasons given for expulsion, a jury could not reasonably have found that "his use of the Club's facilities to conduct business with" referred to Blodgett "earning income from," rather than "using our Club to consort with," "persons who publicly expound racist and anti-Semitic views." Summary judgment was properly granted to the Club. *See LaPrade v. Rosinsky,* 882 A.2d at 196.

## C. Political Affiliation

We also conclude that Blodgett has failed to present a viable claim of discrimination based on the Act's much more specific definition of "political affiliation." " 'Political affiliation' means the state of belonging to or endorsing any political party." D.C.Code § 2–1401.02(25) (2001 & 2006 Supp.). Under this definition, it is insufficient for Blodgett to allege or even to establish that he was expelled for "political reasons" or his "politics generally." The closest that Blodgett comes to stating that the expulsion was based on his "belonging to or endorsing a[] political party" is his allegation that the action was based on his affiliation with the National Alliance. However, Blodgett has provided no evidence that the National Alliance is a political party under any "ordinary sense and with the meaning commonly attributed to" that term. *See Peoples Drug Stores,* 470 A.2d at 753.[10] We affirm the trial

9. See note 8, *supra.*

10. The Human Rights Act does not define "political party," but we find guidance in statutes that do define the term. *See, e.g.,* D.C.Code § 1–1101.01(10) (2001) ("The term 'political party' means an association, committee, or organization which nominates a candidate for election to any office and qualifies under Chapter 10 of this title, to have the names of its nominees appear on the election ballot as the candidate of that association, committee, or organization."); 2 U.S.C.

court's grant of summary judgment on this claim.[11]

\* \* \*

Having concluded that the trial court properly granted summary judgment rejecting Blodgett's claims that the Club violated the Human Rights Act when it expelled him, we do not consider the Club's argument that enforcing the Act in the manner requested would violate the Club's First Amendment freedom of expressive association.

## IV. Blodgett's Additional Claims

Each of Blodgett's remaining claims fails as a matter of law, and we affirm the trial court's grant of summary judgment. *See Nader v. de Toledano,* 408 A.2d 31, 42 (D.C.1979) ("[A] motion for summary judgment should be granted if (1) taking all reasonable inferences in the light most favorable to the nonmoving party, (2) a reasonable juror, acting reasonably, *could not* find for the nonmoving party, (3) under the appropriate burden of proof." (emphasis in original)).

### A. Defamation/False Light

Blodgett claims that the defendants defamed him by compiling and using the written report of the investigative committee. He also complains about comments supposedly made by defendant Farrell to the other Board members describing threats allegedly made by persons who supported Blodgett.[12]

 To state a cause of action for defamation, a plaintiff must allege four elements:

(1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm.

*Oparaugo v. Watts,* 884 A.2d 63, 76 (D.C. 2005). These elements are similar to those of an invasion of privacy-false light claim, which "requires a showing of: (1) publicity (2) about a false statement, representation or imputation (3) understood to be of and concerning the plaintiff, and (4) which places the plaintiff in a false light that would be offensive to a reasonable person." *Kitt v. Capital Concerts, Inc.,* 742 A.2d 856, 859 (D.C.1999) (citing Restatement (Second) of Torts § 652E (1977)). " '[A] plaintiff may not avoid the strictures of the burdens of proof associated with defamation by resorting to a claim of false light

§ 431(16) (2007) (" 'political party' means an association, committee, or organization which nominates a candidate for election to any Federal office whose name appears on the election ballot as the candidate of such association, committee, or organization."). *See also* D.C.Code § 1–204.01(b)(2) (2001) ("not more than 2 of the at-large members [of the Council] (excluding the Chairman) shall be nominated by the same political party").

11. However, we reject the appellees' argument, and the trial court's conclusion, that only government employees enjoy protection against "political affiliation" discrimination. The cases appellees rely on, such as *Rutan v.*

*Republican Party of Ill.,* 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990), are neither binding nor instructive because they were not interpreting a statute such as ours which specifically prohibits denying any person "the full and equal enjoyment of the ... services [and] facilities ... of any place of public accommodations" based on the "political affiliation ... of any individual." D.C.Code § 2–1402.31(a)(1).

12. Blodgett made additional claims of defamation below, but he has not pursued them on appeal.

invasion.'" *Klayman v. Segal*, 783 A.2d 607, 619 (D.C.2001) (quoting *Moldea v. New York Times Co.* (*Moldea II*), 306 U.S.App. D.C. 1, 10, 22 F.3d 310, 319 (1994)). In fact, where the plaintiff rests both his defamation and false light claims on the same allegations, as Blodgett has done here, the claims will be analyzed in the same manner. *See Harrison v. Washington Post Co.*, 391 A.2d 781, 784 n. 8 (D.C.1978).

### 1. The Investigative Report

After the Board voted to temporarily suspend Blodgett on January 14, President Scott Beck appointed a two-member committee to investigate the complaints against him. They interviewed twenty-five persons, including Blodgett, and summarized their interviews in a written report which they presented at the February 3 Board meeting. The investigators began each interview by reading a statement which requested, among other things, that the interviewee "treat [the investigation] confidentially" to "preserve the integrity of the investigation and ... to be sensitive to the privacy concerns of those involved." We have not been directed to evidence that the report itself was seen by anyone apart from the Board (and persons involved in this litigation).

■ Acknowledging that the defendants were not the original declarants,[13] Blodgett claims that the Board defamed him by repeating the statements of the witnesses and "endors[ing] the Investiga-

tive Report" by deciding to expel him. We will assume that the defendants' discussion of the report amounted to "publication." *See Heard v. Johnson*, 810 A.2d 871, 886 n. 6 (D.C.2002). We will also assume that there is a genuine issue of material fact concerning the truth or falsity of some of these statements.

Nevertheless, the record establishes that the Board's creation and use of the report were protected by the qualified "common interest" privilege.[14] *See Moss v. Stockard*, 580 A.2d 1011, 1024 (D.C. 1990). Because Blodgett voluntarily joined the Club and agreed to be bound by its by-laws and rules, his conduct within the Club became a matter of "common interest" to the defendants. *Cf. Heard*, 810 A.2d at 886 n. 6 (common interest privilege applied to discussions among church members concerning disciplinary action against pastor); *Aspell v. American Contract Bridge League of Memphis, Tennessee*, 122 Ariz. 399, 595 P.2d 191, 192 (Ct.App.1979) (common interest privilege applied "to the disciplinary proceedings of a voluntary association where the subject of the communication is a member of the association"); *Preston v. Land*, 220 Va. 118, 255 S.E.2d 509, 510–11 (1979) (qualified privilege protected statements of one private club member describing to board of directors alleged behavior of two other club members).

■ "To come within the protection of the 'common interest' privilege, the

---

13. Spaulding is the only named defendant who was involved in preparing summaries of the alleged defamatory statements.

14. The trial court concluded that "the 'implied consent' doctrine protects the fruits of the investigation and the publishing of such information to the relevant persons in the Club." *See Joftes v. Kaufman*, 324 F.Supp. 660, 662 (D.D.C.1971). We prefer to rely upon the conceptually similar common inter-

est privilege. *See Cellular Radio Corp. v. OKI America, Inc.*, 664 A.2d 357, 359 (D.C.1995) ("We may affirm summary judgment on different grounds from the trial court if it is clear from the record that the issues were argued below."). Blodgett argued in the trial court against applying the common interest privilege; therefore, he is not prejudiced by our alternative analysis.

statement must have been (1) made in good faith, (2) on a subject in which the party communicating has an interest, or in reference to which he has, or honestly believes he has, a duty to a person having a corresponding interest or duty, (3) to a person who has such a corresponding interest." *Moss,* 580 A.2d at 1024 (citing *Ingber v. Ross,* 479 A.2d 1256, 1264 n. 8, 1268–69 (D.C.1984)); *accord, Smith v. District of Columbia,* 399 A.2d 213, 220 (D.C. 1979) (opinion of trial court expressly adopted by this court). "[O]nce it is decided that the communication is privileged, the burden is on the plaintiff to prove the privilege has been abused." *Alfred A. Altimont, Inc. v. Chatelain, Samperton & Nolan,* 374 A.2d 284, 290 (D.C.1977). The plaintiff may defeat the privilege by showing that the statement was made with "express malice or malice in fact." *Moss,* 580 A.2d at 1024.

Here, it is obvious from the circumstances that Blodgett's conduct was a matter of common interest to the Club and its Board. *See Columbia First Bank v. Ferguson,* 665 A.2d 650, 655 (D.C.1995) ("Whether a statement is protected by a privilege is a question of law for the court."). The defendant Board members, called upon to perform their disciplinary duties under the by-laws, had a legitimate interest in conducting an investigation before voting on the question of expulsion. And the investigation was conducted in a circumspect manner. As the contents of the report reveal, the investigators focused on "elicit[ing] first hand knowledge of events, language or conduct," rather than hearsay. They also asked each interviewee for both favorable and unfavorable information about Blodgett, and requested that each one treat the investigation confidentially, "to be sensitive to the privacy concerns of those involved."

▮ In order to defeat this qualified privilege, Blodgett must either: (1) provide "extrinsic proof" that the defendants who produced and used the report acted with express malice, or (2) demonstrate that it is "so excessive, intemperate, unreasonable, and abusive as to forbid any other reasonable conclusion than that the defendant[s] [were] actuated by express malice...." *Moss,* 580 A.2d at 1024 (quoting *Ashford v. Evening Star Newspaper Co.,* 41 App. D.C. 395, 405 (1914)). Blodgett has failed to produce any evidence sufficient to meet this demanding standard. *See Mosrie v. Trussell,* 467 A.2d 475, 477 (D.C.1983) (citing *Ford Motor Credit Co. v. Holland,* 367 A.2d 1311, 1314 (D.C.1977)); *Columbia First Bank,* 665 A.2d at 656. *See also Moss,* 580 A.2d at 1025 n. 27 ("proof that the statement was in fact false is alone insufficient to show malice"). The report certainly was not "pure 'rumor' or 'gossip' or 'scuttlebutt' conveyed as fact, without any disclaimer or explanation." *Columbia First Bank,* 665 A.2d at 656. Although Blodgett asserts in conclusory fashion that the investigation was conducted in bad faith, he has not proffered evidence to validate this claim. A substantial proffer would be required, because "the mere existence of ill will on the part of the publisher toward the subject of the publication does not defeat the publisher's privilege if the privilege is otherwise established by the occasion and a proper purpose." *Mosrie,* 467 A.2d at 477. Even if Blodgett could prove that the defendants felt "resentment and indignation towards [him]," the privilege would not be forfeited since "the primary purpose" of sharing the report was "to further the interest which is entitled to protection." *Id.* at 477–78. In sum, "the privilege is ... established by the occasion and a proper purpose," *id.,* and Blodgett has not

created a genuine issue of material fact with respect to the question of malice.[15]

### 2. Statements by Farrell

 Blodgett also claims that defendant Farrell told other Board members at a March meeting that supporters of Blodgett had threatened him with physical harm if the Board expelled Blodgett. (Farrell denied making the statement.) As the plaintiff, Blodgett has the burden of showing that Farrell made a defamatory statement concerning him. *See Clawson v. St. Louis Post–Dispatch, L.L.C.,* 906 A.2d 308, 312–13 (D.C.2006). However, he proffered no testimony that the statement, if made, was false. Moreover, Scanlon admitted that he could not remember the exact words that Farrell used at the meeting. Assuming that Farrell told other members of the Board that he had been threatened by two men "on behalf of" Blodgett, as Scanlon testified at one point in his deposition, that statement does not *defame* Blodgett. The two men could have been acting on their own. No one said that Farrell claimed Blodgett was present or had put the two men up to it. Viewing the evidence in the light most favorable to Blodgett, there is no genuine issue of material fact as to whether Farrell made a *false* statement *defaming* Blodgett.

### B. Breach of Contract/Lack of Fundamental Fairness

 Blodgett asserts that the Club breached its own by-laws when it temporarily suspended him pending its investigation. He also argues that the Board's investigation, hearing, and ultimate deci-

sion to expel deprived him of "fundamental fairness." We begin by noting that, within the District of Columbia, " 'courts ordinarily will not interfere with the management and internal affairs of a voluntary association.' " *Levant v. Whitley,* 755 A.2d 1036, 1043 (D.C.2000) (quoting *Avin v. Verta,* 106 A.2d 145, 147 (D.C.1954)). *See also National Association for the Advancement of Colored People v. Golding,* 342 Md. 663, 679 A.2d 554, 558 (1996) ("as a general rule, courts will not interfere in the internal affairs of a voluntary membership organization"). "[W]hen a party comes into court for relief it is incumbent upon him to show the existence of facts to justify the interference of the court." *United States ex rel. de Yturbide v. Metropolitan Club,* 11 App.D.C. 180, 201 (1897).[16]

In *Levant* we assumed, without deciding, "that intervention would be appropriate when an organization failed to follow its own rules." *Id.* at 1044. *See id.* at 1043–44 n. 11 (summarizing state of the law in the District of Columbia and elsewhere). The plaintiff in that case had received notice of the charges and an opportunity to be heard, and the grievance committee had interviewed roughly two dozen persons. We concluded that the process "was fundamentally fair and not in conflict with designated procedures, and tainted neither by fraud, nor bad faith, nor arbitrary action. . . ." *Id.* at 1045. We therefore decided that judicial intervention was not appropriate. *Id.* at 1046. In the present case we similarly decline to intervene, but do not decide when, if ever, it would be appropriate to do so.

15. There is no genuine issue of material fact as to "excessive publication." Although Blodgett also complains that Armstrong threatened to reveal his membership file, there is no evidence that Armstrong did so or, if he did, that he shared it with anyone who lacked a common interest in its contents.

16. By virtue of statutory definition, The University Club is a public accommodation covered by the Human Rights Act, but it properly is treated as a private organization in this context.

### 1. Did The Club Follow Its Own Rules?

The Club's by-laws require that the Board give notice and an opportunity to be heard before "a member may be reprimanded, suspended, or expelled for cause.…" In this case both requirements were honored. Before any decision was made to charge him, Blodgett and his counsel spoke at length with the investigating committee. The investigators also heard from several persons who supported Blodgett. Following the investigation, the Board notified him of the specific charges in a letter dated February 11, 2000. That letter also informed Blodgett that the Board would hold a hearing on March 2 and that he could be heard and represented by another member of the Club. (Blodgett's counsel (a Club member) also addressed the Board on February 3 and February 28.) Finally, Blodgett and his counsel appeared at the March 2 hearing. Blodgett presented his defense by reading a prepared statement and he answered questions from Board members before his counsel made a closing statement. After discussion, the Board voted by a margin of 8–2 (a two-thirds majority of those present was required) to expel Blodgett if he declined an opportunity to resign. These procedures fully complied with the by-laws governing expulsion.

Blodgett complains, nevertheless, that the Executive Committee violated the by-laws when it voted on January 14 to suspend him immediately, pending the outcome of an investigation. He asserts that this action was prejudicial because it denied him access to the Club, where he could most readily confer with sympathetic members and potential witnesses, and thus hampered the preparation of his defense.

In order for the full Board of Governors to suspend a member, it would have to give written notice of the reason at least ten days before considering such action. Moreover, the member would "be entitled to be heard at the meeting and to be represented by another member of the Club." But the by-laws specifically authorize the Executive Committee to suspend a member temporarily "pending action by the [Board], and such suspension may be without notice to the member if, in the opinion of the Executive Committee, the exigencies of the case so require."

Blodgett protests that the Executive Committee was simply a tool of the Board and that its vote was, in reality, an illegal attempt by the Board to suspend him without providing notice or a hearing. He also asserts that there was no exigency. To support his arguments, Blodgett points to the following undisputed sequence of events: (1) on January 14 the Board voted (9–1) to "commence an immediate investigation" of Blodgett's conduct "coupled with immediate action by the Executive Committee to suspend Mr. Blodgett's membership pending the outcome of the Board action"; (2) without asking the other Board members to leave the room, those comprising the Executive Committee voted unanimously to suspend Blodgett; and (3) immediately following that vote, the full Board went back into Executive Session, authorized the investigation, and gave President Beck authority to ask for Blodgett's resignation.

Blodgett argues that the Executive Committee is allowed to act summarily only in those situations when it is not practical to convene a meeting of the full Board of Governors. Because the Board was in session on January 14, he asserts, there was no exigency allowing the Executive Committee to suspend him. However, according to the members of the Executive Committee, the "exigencies" were created by the volatile situation in the Club and

complaints from members who threatened to resign unless some action was taken.

The by-laws neither define an exigency nor forbid the action taken here. Indeed, they entrust assessment of "the exigencies of the case" to "the opinion of the Executive Committee." It is not our role to second-guess the committee's appraisal of the situation. Nor has Blodgett convinced us that the Board usurped the power of the Executive Committee. The minutes reflect that all six members of the Executive Committee (all of whom were members of the Board) endorsed the plan of action outlined above. It therefore is not surprising that, when convened as a committee, they acted consistently with their previous votes. Indeed, it is odd to suggest that the other three members of the Board who favored this plan could overcome the will (and thus dictate the action) of the six-member committee.[17] In sum, Blodgett has not established that the Club violated its own rules.

### 2. Were The Procedures Fundamentally Fair?

Some courts look beyond the organization's by-laws and consider whether the procedures followed satisfy the requirements of substantial fairness. *See Levant,* 755 A.2d at 1045–46; *Golding,* 679 A.2d at 561 ("members in a private organization are entitled to at least rudimentary procedural protections, such as notice and an opportunity to be heard"). However, a member facing discipline is not entitled to the same type of process afforded under our civil and criminal justice systems. *See National Collegiate Athletic Ass'n v. Tar-*

*kanian,* 488 U.S. 179, 191, 109 S.Ct. 454, 102 L.Ed.2d 469 (1988) ("Embedded in our Fourteenth Amendment[18] jurisprudence is a dichotomy between state action, which is subject to scrutiny under the Amendment's Due Process Clause, and private conduct, against which the Amendment affords no shield, no matter how unfair that conduct may be."). Instead, when courts do interfere, they look to common law concepts of fundamental fairness. *See Pinsker v. Pacific Coast Society of Orthodontists,* 12 Cal.3d 541, 553, 116 Cal.Rptr. 245, 526 P.2d 253, 262 (1974). As we have discussed, the Board gave Blodgett written notice of the charges; it also provided him with a copy of the investigative report, which included a summary of interviews with staff and members of the Club and served as the basis for the charges against him. The Board also heard from Blodgett and his counsel.

### a. Allegations of Bias

Nevertheless, Blodgett argues that he was denied fundamental fairness because the result of the investigation was predetermined to result in his expulsion. He offers nothing but conclusory allegations to support this claim. The report of the investigation was not one-sided, as Blodgett suggests. The investigating committee heard from several persons who supported Blodgett, and twelve pages of the thirty-seven-page report were devoted to summarizing the committee's interview with Blodgett. Indeed, the thoroughness of the report, and its supporting documentation, demonstrate that the Club's decision was

---

**17.** The fourth member of the Board in attendance that day who was not on the Executive Committee (Terrence Scanlon) thought that the investigation should be completed before there was any decision about suspending Blodgett.

**18.** In the District of Columbia, the Fifth Amendment, rather than the Fourteenth, applies. *Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

not arbitrary.[19]

Blodgett also relies upon a conversation he had with the Club's President Scott Beck and its General Manager Albert Armstrong on January 14. The parties agree that Beck and Armstrong informed Blodgett that he had been temporarily suspended pending the outcome of an investigation. They then offered him an opportunity to resign and avoid a hearing. Being generally aware of previous complaints about Blodgett and knowing about the fervent reaction to the *Post* article, Armstrong urged Blodgett to resign, suggesting the investigation "would not go well for him." This prediction in no way establishes that the outcome of any investigation was predetermined.

Blodgett does not allege that the entire Board was biased against him. Indeed, two of its members voted against expulsion. This, by itself, is important evidence that the proceedings were not a fraud, or conducted in bad faith. (Previously, on February 3, 2000, another member of the Board had recused himself from participating in the disciplinary proceedings.) So far as Blodgett has demonstrated, he did not ask any other members of the Board to recuse themselves. In support of his motion for summary judgment, however, Blodgett offered evidence that defendant Farrell made his decision before the investigation began.[20] Even if this evidence were credited, and Farrell's vote were ex-cluded for bias, there still would have been enough votes (seven in favor; two opposed) to satisfy the by-laws' requirement of a two-thirds majority. The same would be true if Spaulding's vote were discarded as well (six in favor, two opposed). Although Blodgett has asserted in conclusory fashion that others were biased, "[t]he mere allegation of bias will not suffice to set aside the Club's decision." *Caposella v. Pinto*, 265 A.D.2d 362, 696 N.Y.S.2d 493, 495 (N.Y.App.Div.1999). Blodgett therefore has not made "a factual demonstration to support the allegation of bias and proof that the outcome flowed from it." *Id.*

Members of a voluntary association cannot always expect to find, and more importantly are not entitled to, the type of neutral and disinterested arbiters provided for in judicial proceedings. A requirement that any decision-maker with knowledge of the dispute or an interest in its outcome must recuse himself might well leave no members to resolve the matter. *See Hall v. Morrin*, 293 S.W. 435, 440 (Mo.Ct.App. 1927) (requiring complete impartiality would lead to the impermissible result that no tribunal could exist to consider charges against a member who insults or slanders the entire membership of the association).

■■ Thus, it is widely accepted that members of a board considering disciplinary charges may have prior involvement in the case. *See Adkins v. Sarah Bush Lincoln Health Ctr.*, 129 Ill.2d 497, 136 Ill.

---

**19.** The Club's by-laws do not require that the Board conduct an investigation before voting to expel a member.

**20.** In his deposition, Blodgett also claimed that defendant Spaulding was prejudiced, pointing to their divergent political views and Spaulding's role in a separate investigation of Blodgett's alleged anti-Semitic behavior at the Club. These facts, even if true, are not sufficient to establish the level of bias necessary for this court to intervene in the affairs of a private association. *See Adkins v. Sarah Bush*

*Lincoln Health Ctr.*, 129 Ill.2d 497, 136 Ill. Dec. 47, 544 N.E.2d 733, 740 (1989) (no disqualifying bias where the same individuals acted as arbiters in a separate investigation from the one presently before the court for review). Blodgett also claims that Spaulding was biased because of his position as the junior law partner of appellees' counsel. This accusation likewise falls short of requiring judicial intervention in the Board's decision-making.

Dec. 47, 544 N.E.2d 733, 741 (1989) ("Preknowledge of the facts associated with the proceeding before a committee ... will not be enough to suggest actual unfairness sufficient to disqualify a committee or individual members of a committee."); *Greene v. Board of Trade*, 174 Ill. 585, 51 N.E. 599, 601 (1898) ("The fact that the charges are preferred by a member of the board of directors which is to try the accused would not be cause for interference by a court of equity to prevent a trial."); *Harris v. Aiken*, 76 Kan. 516, 92 P. 537, 538 (1907) (fact that three members of the board "started the investigation which resulted in the hearing and condemnation of Harris, did not incapacitate them from sitting in judgment upon him"). *See also Withrow v. Larkin*, 421 U.S. 35, 55, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975) ("The mere exposure to evidence presented in nonadversary investigative procedures is insufficient in itself to impugn the fairness of the Board members at a later adversary hearing."). Indeed, "without more, such as a finding of fraud or collusion, a finding of mere bias in the proceedings of a social organization is not sufficient to invoke an exception to the rule against judicial interference." *Werst v. Three Fires Council of the Boy Scouts of America*, 346 Ill.App.3d 706, 282 Ill.Dec. 90, 805 N.E.2d 709, 718 (2004) (judicial intervention not proper even where "primary accuser" was on the committee that decided to revoke individual's membership). *See Rose v. Zurowski*, 236 Ga.App. 157, 511 S.E.2d 265, 267–68 (1999) (hearing was not unfair, or lacking in good faith, although member did not have the right "to disqualify members of the tribunal whose wives were witnesses at the hearing"). *But see Van Daele v. Vinci*, 51 Ill.2d 389, 282 N.E.2d 728, 731 (1972) (an important economic interest was affected; there were "too many factors indicating that the proceedings were in fact not good faith disciplinary hearings," including that seven members of an eleven member board were defendants in a pending derivative action brought by the members who were expelled by the board). Blodgett has failed to show that the procedures were tainted by fraud or bad faith.

### b. Withholding the Identity of Witnesses

 Blodgett also complains that the Board withheld the identities of the Club members and staff who spoke with the investigating committee. In this context, however, the right to know the identity of one's accusers, or to confront and cross-examine them, is not so well-established as to be a requirement of fundamental fairness.

As we have seen, the courts of this jurisdiction "ordinarily will not interfere with the management and internal affairs of a voluntary association." *Levant*, 755 A.2d at 1043. It therefore is no surprise that we have not established a right to know one's accusers or to confront and cross-examine witnesses in disciplinary hearings of this sort. Blodgett certainly has not cited any controlling precedent requiring such procedures. Our own research has disclosed cases from other jurisdictions taking both sides of the question. *See, e.g., Kurz v. Federation of Petanque, U.S.A.*, 146 Cal.App.4th 136, 150, 52 Cal.Rptr.3d 776, 787 (2006) (suspension of volunteer umpires; common law requirement of fair procedure did not require "a full blown adversarial process with the right to counsel and cross-examination"); *Davenport v. Society of the Cincinnati*, 46 Conn.Supp. 411, 754 A.2d 225, 241–42 (1999) (action to enjoin expulsion from private hereditary, military, and patriotic association; concluding that the procedures were fundamentally fair although member was not allowed to confront and cross-examine the witnesses

against him); *Rose v. Zurowski,* 236 Ga. App. 157, 511 S.E.2d 265, 267 (1999) (rejecting complaint that disciplinary "hearing was conducted without Rose having the right to face or cross-examine his accusers"); *Lawrence v. Ridgewood Country Club,* 635 S.W.2d 665, 667 (Tex.App. 1982) (six-month suspension; rejecting argument that member "was entitled to a trial type hearing with an opportunity to cross-examine witnesses"); *but see Gibson v. Boy Scouts of America,* 359 F.Supp.2d 469 (E.D.Va.2005) (removal of scoutmaster; ordering hearing at which scoutmaster would have, among other things, the right to cross-examine witnesses), *aff'd on other grounds,* 163 Fed. Appx. 206 (4th Cir.2006); *Hackethal v. California Medical Assn.,* 138 Cal.App.3d 435, 442, 187 Cal.Rptr. 811, 815 (1982) ("There must be an opportunity to confront and cross-examine the accusers and to examine and refute the evidence."). Ultimately, we are persuaded that "[r]equiring procedures equivalent to those necessary for trials would convert expulsion hearings into full-fledged adversary proceedings interfering with a private society's fundamental right to manage its own affairs." *Davenport,* 754 A.2d at 241.

■ "The common law requirement of a fair procedure does not compel formal proceedings with all the embellishments of a court trial, nor adherence to a single mode of process." *Pinsker,* 12 Cal.3d at 555, 116 Cal.Rptr. 245, 526 P.2d at 263 (citation omitted). "It may be satisfied by any one of a variety of procedures which afford a fair opportunity for [an individual] to present his position." *Id.* Accordingly, we will "not attempt to fix a rigid procedure that must invariably be observed." *Id.* In some cases, for example, it may be adequate to provide an opportunity for "a mere written response"; in other circumstances, "a personal appearance by the

adversely affected individual and a more extensive hearing [may be] required." *Ezekial v. Winkley,* 20 Cal.3d 267, 279, 142 Cal.Rptr. 418, 572 P.2d 32, 39 (1977). Although it might well have been helpful for Blodgett to know the names of those who had been interviewed by the committee, that is not a requirement of basic fairness. Here, it is important to reiterate, he had detailed summaries of the witnesses' statements, an advantage that is not required either in the Club's by-laws or by case law.

In this case, as in *Levant,* the process "was fundamentally fair and not in conflict with designated procedures, and tainted neither by fraud, nor bad faith, nor arbitrary action...." 755 A.2d at 1045. In sum, Blodgett has failed to present facts that would allow this court to intervene in the disciplinary decisions of the Club.

### C. Intentional Infliction of Emotional Distress

■ To prevail on a claim for intentional infliction of emotional distress, a plaintiff is required to prove that the defendant engaged in extreme or outrageous conduct which intentionally or recklessly caused severe emotional distress. *McManus v. MCI Communications Corp.,* 748 A.2d 949, 958 (D.C.2000). "Liability is imposed only for conduct 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Id.* (quoting *Homan v. Goyal,* 711 A.2d 812, 818 (D.C.1998)).

■ Blodgett contends that this test has been satisfied because the Club had knowledge of his emotional vulnerability. Prior to his expulsion, he provided the Board with a letter from his psychotherapist which stated that "recent events have thrown [Blodgett] into a clear sense of despair, panic, and confusion." Dr. Weiner recommended that, "if at all possible,"

the Club refrain from expelling Blodgett but instead place him on probation while he continued counseling. Blodgett relies on *Anderson v. Prease*, 445 A.2d 612, 613 (D.C.1982), which states that, "[a]lthough the actor's conduct may generally not be considered extreme or outrageous, it may be characterized as such when the actor knows that the other person is peculiarly susceptible to emotional distress." However, this case is not comparable to *Anderson*, where the physician-defendant, knowing of his patient's fragile nervous condition, "cursed [her] and screamed at her to leave his office." *Id.* at 613.

"It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery...." *Homan*, 711 A.2d at 818 (internal quotation marks and citations omitted). The trial court concluded that these circumstances did not permit recovery, and we agree. To accept Blodgett's argument on this record would effectively allow him to immunize himself from a normal disciplinary process, and we decline to extend the definition of extreme or outrageous conduct in this fashion.

## V. Mr. Fetner's Role in the Depositions

Blodgett also appeals three orders of the trial court related to P. Jay Fetner's participation in this litigation. (Fetner is not a party to this appeal.) A law school graduate who has never been admitted to the District of Columbia Bar, Mr. Fetner previously was a *pro se* plaintiff in similar litigation against The University Club and its Board. He assisted Blodgett's legal team by reading and organizing documents, investigating facts, attending depositions, and suggesting lines of inquiry. During at least one deposition, Fetner purported to clarify statements of the witness, and the Club filed an emergency motion for a protective order to clarify and limit Fetner's involvement in the case. "[D]ue to the Court's concerns that he [was] engag[ed] in the unauthorized practice of law," Judge Duncan–Peters ordered that "until he obtains permission to appear *pro hac vice*, Mr. Fetner may not attend the depositions." Blodgett filed a motion for reconsideration, which Judge Long denied. Judge Long also denied Blodgett's motion to admit Fetner *pro hac vice*.

Super. Ct. Civ. R. 26(c) provides that, "[u]pon motion by a party . . . , and for good cause shown, [the Superior Court] may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including . . . that discovery be conducted with no one present except persons designated by the Court." "A court has substantial discretion in deciding to grant a protective order, and its decision to do so will not ordinarily be disturbed on appeal unless that discretion has been abused." *Mampe v. Ayerst Labs.*, 548 A.2d 798, 803–04 (D.C. 1988). "Judicial discretion will not be reversed unless it appears that it was exercised on grounds, or for reasons, clearly untenable or to an extent clearly unreasonable." *Johnson v. United States*, 398 A.2d 354, 363 (D.C.1979) (extensive discussion of abuse of discretion standard of appellate review).

Judge Duncan–Peters made several factual findings to support her order barring Fetner from attending further depositions until he obtained permission to appear *pro hac vice*. For example, the court found that Fetner was an attorney but had never applied for admission to the D.C. Bar and did not fit within any of the exceptions under D.C.App. R. 49; that Fetner had already attended eleven depositions as a "consultant" on behalf of Blodgett; and that he had spoken on the record during at least one of those deposi-

tions, purportedly to clarify the testimony of a witness. Judge Duncan–Peters reasoned that representing a deponent or clarifying deposition testimony constituted the practice of law. Furthermore, Fetner had stated in writing that he was advising appellant on strategy, procedure, and tactics-functions that, during litigation, are normally performed by an attorney. There is ample support for the court's issuance of the protective order, and we will not disturb its ruling. *See Johnson,* 398 A.2d at 364. Similarly, Judge Long did not abuse her discretion in denying Blodgett's motion to reconsider that order. *See Tobin v. John Grotta Co.,* 886 A.2d 87, 90 (D.C.2005) (abuse of discretion standard applies).

The admission of attorneys *pro hac vice* is governed by the rules of this court, which provide, in relevant part:

> The court to which the relevant litigation matter is assigned may grant or deny applications, and withdraw admissions to participate pro hac vice *in its discretion.*

D.C.App. R. 49(c)(7)(vii) (emphasis added). *See also* Super. Ct. Civ. R. 101(a)(3). The decision to deny Fetner admission *pro hac vice* is amply supported by the record. Furthermore, none of these decisions relating to Fetner has prejudiced Blodgett because he had ample legal representation below. *See Johnson,* 398 A.2d at 367 (we will not hold that the trial court has "abused" its discretion unless the impact of an error is sufficiently prejudicial to require reversal).

## VI. Conclusion

For the reasons discussed, the judgment of the Superior Court is hereby

*Affirmed.*